Cynthia KING, Appellant,

v.

**UNITED STATES DEPARTMENT OF JUSTICE.**

No. 84-5098.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 7, 1984.

Decided Sept. 25, 1987.

As Amended Sept. 28, 1987.

Timothy Trushel, Washington, D.C., for appellant.

Charles J. Sheehan, Dept. of Justice, of the Bar of the District of Columbia Court of Appeals, pro hac vice, by special leave of the Court, with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees.

Before ROBINSON and STARR, Circuit Judges, and WRIGHT, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

Opinion concurring in part and concurring in the judgment filed by Circuit Judge STARR.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

In this Freedom of Information Act (FOIA)[1] case, appellant, Cynthia King, seeks production by the Federal Bureau of Investigation (FBI) of documents relating to her deceased mother-in-law, Carol King, a civil rights attorney and activist about whose career appellant is writing a book.[2] The FBI has released many of the documents—most, however, in redacted form.[3] The agency contends that its decision to withhold portions of the requested information is authorized by Exemptions 1 and 7 of the Act,[4] which respectively except from FOIA's disclosure mandate, documents classified for national security reasons and certain other material gathered during investigations for law-enforcement purposes. Appellant challenges the applicability of either exemption in the circumstances presented here.[5]

The District Court denied motions by appellant for summary judgment or in the alternative to compel discovery, rejected appellant's request for in-camera inspection, and granted the FBI's motion for summary judgment.[6] This appeal ensued.

I

The records whose disclosure is here at issue are part of an FBI surveillance file on Carol King compiled during the 1940's and 1950's. She was a prominent civil rights attorney who devoted her practice to defending minorities, aliens, radicals and union members both famous and obscure;[7] and a substantial portion of her practice consisted in representation of aliens facing deportation during the McCarthy era.[8] The nature of Carol King's law practice and her political associations aroused suspicions of the FBI. In 1941, the FBI opened

---

1. 5 U.S.C. § 552 (1982 & Supp. II 1985) (as amended by Freedom of Information Reform Act of 1986, Pub.L. No. 99–570, subtit. N, §§ 1801–1804, 100 Stat. 3207, 3248–3250 (1986)). For a discussion of the 1986 Amendments as they affect Exemption 7, one of the two statutory exceptions involved here, see infra note 136.

2. King v. United States Dep't of Justice, 586 F.Supp. 286, 289 (D.D.C.1983).

3. The FBI referred two one-page documents to the Immigration and Naturalization Service (INS) for review and response to the requester. King v. United States Dep't of Justice, supra note 2, 586 F.Supp. at 289, 296. INS released these documents but deleted the name of one informant, id., the withholding of which appellant also contests. See Brief for Appellant at 36–37; Reply Brief for Appellant at 1.

4. 5 U.S.C. § 552(b)(1) (1982); id. § 552(b)(7) (as amended by Freedom of Information Reform Act of 1986, Pub.L. No. 99–570, subtit. N, § 1802, 100 Stat. 3207, 3207–48, 3207–49 (1986)).

5. See King v. United States Dep't of Justice, supra note 2, 586 F.Supp. at 289.

6. Id.

7. See Exhibits A–J to Plaintiff's Motion for Summary Judgment Or, In the Alternative, To Compel Answers to Interrogatories and Response to Request for Production of Documents, King v. United States Dep't of Justice, Civ. No. 81–1485 (D.D.C.) (filed Oct. 13, 1982), Record on Appeal (R.) 27A [hereinafter Plaintiff's Motion for Summary Judgment].

8. Id.

a surveillance file on her, and subjected her to continuous investigation until her death in 1952.[9] The FBI represents that its investigation was devoted exclusively to determining whether Carol King was guilty of political sedition.[10] While the eleven-year investigation amassed a file 1,665 pages in length,[11] no charge was ever made.

Appellant is a writer by profession who intends to publish a biography on her mother-in-law and longtime friend, Carol King.[12] As yet, no significant history of the latter's career has been published.[13] In the course of her research, appellant attempted to obtain information pertaining to Carol King by means of a FOIA request. The FBI eventually responded by releasing to appellant redacted portions of its King investigative file. Ultimately provided were 1,500 pages of the 1,665–page file, and, from most of the 1,500 pages supplied, names and, frequently, substantial passages were deleted.[14]

Contesting the sufficiency of the FBI's response to her FOIA request, appellant filed suit in the District Court,[15] and moved for a *Vaughn* index[16] detailing the grounds for the FBI's exemption claims.[17] Production of the *Vaughn* index was ordered.[18] Thereafter, the FBI submitted the joint declaration of Special Agents Richard C. Staver and Walter Scheuplein, Jr.,[19] and the declaration of John H. Walker of the Immigration and Naturalization Service,[20] attesting to the reasons for excising portions of the King file; it then moved for summary judgment.[21] Appellant in turn moved for summary judgment, or in the alternative to compel a response to outstanding discovery requests.[22]

The District Court granted the FBI's motion for summary judgment.[23] It sustained the Exemption 1 contentions, relying on the Staver-Scheuplein declaration, which it found to set forth with "reasonable specificity of detail rather than mere conclusory statements"[24] an adequate description of the portions of the King file withheld, as well as the national security considerations advanced in support of the FBI's refusal to

9. Joint Declaration of Richard C. Staver and Walter Scheuplein, Jr., *King v. United States Dep't of Justice,* Civ. No. 81–1485 (D.D.C.) (filed Jan. 29, 1982) at 35, R. 16 [hereinafter cited as Staver-Scheuplein Declaration].

10. The Staver-Scheuplein declaration avers that the file was compiled for law-enforcement purposes pursuant to predecessor versions of 18 U.S.C. § 2383 (1982) (rebellion or insurrection), *id.* § 2384 (seditious conspiracy), and *id.* § 2385 (overthrow of the Government). Staver-Scheuplein Declaration, *supra* note 9, at 35, R. 16; see also text *infra* at note 147 (reproducing declaration in relevant part).

11. Staver-Scheuplein Declaration, *supra* note 9, at 35, R. 16.

12. See Exhibit J to Plaintiff's Motion for Summary Judgment, *supra* note 7, R. 33.

13. Brief for Appellant at 34.

14. *King v. United States Dep't of Justice, supra* note 2, 586 F.Supp. at 289; see Exhibit A to Staver-Scheuplein Declaration, *supra* note 9, R. 16. INS released the two pages referred to it by the FBI, see note 3 *supra,* but deleted an informant's name purportedly pursuant to Exemption 7(D). See *King v. United States Dep't of Justice, supra* note 2, 586 F.Supp. at 289.

15. R. 1.

16. See *Vaughn v. Rosen,* 157 U.S.App.D.C. 340, 484 F.2d 820 (1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

17. R. 3.

18. R. 5.

19. See Staver-Scheuplein Declaration, *supra* note 9. The declaration consists of two parts: the first, by Special Agent Staver, sets forth the grounds for the FBI's Exemption 1 position and the second, by Special Agent Scheuplein, addresses the FBI's remaining withholding claims, including those under Exemption 7.

20. Declaration of James H. Walker, *King v. United States Dep't of Justice,* Civ. No. 81–1485 (D.D.C.) (filed Jan. 29, 1982), R. 19. The Walker declaration addresses the action taken by INS in the name of Exemption 7(D). See notes 3, 14 *supra.*

21. R. 16.

22. R. 26A.

23. *King v. United States Dep't of Justice, supra* note 2.

24. 586 F.Supp. at 291.

disclose.[25] Similarly, the District Court deemed the declaration a sufficient foundation for the FBI's claims under Exemptions 7(C) and 7(D) that information withheld was gathered pursuant to an investigation for law-enforcement purposes and that its release would constitute an unwarranted invasion of personal privacy or compromise assurances of source confidentiality.[26]

Appellant urges us to hold that the District Court erred in crediting the FBI's Exemption 1 and 7 arguments, contending that they shield information in contravention of FOIA's broad disclosure mandate. Specifically, appellant asserts that the Staver-Scheuplein declaration presents only a vague and conclusory description of the material excised pursuant to Exemption 1, wholly inadequate for purposes of ascertaining whether the documents in question have in fact been properly classified, or what harm might result from their production.[27] "How," appellant queries, "can release of ... records of this nature and at this late date possibly damage the national security?"[28] Appellant further contends that the Staver-Scheuplein declaration does not make the threshold showing required for resort to Exemption 7: that the documents in question were compiled for bona fide law-enforcement purposes pursuant to an investigation whose relation to the agency's law-enforcement duties is based on information sufficient to support at least a "'colorable claim' of its rationality."[29] And, whether or not a law-enforcement purpose originally animated the investigation, appellant insists no considerations of privacy or confidentiality warrant contin-

ued withholding of its fruits.[30] While we reject appellant's challenge to the disposition of the Exemption 7 claims in this case, we believe valid objections to the FBI's showing on the Exemption 1 claims have been raised, and remand in order that the District Court secure a fuller elaboration of the FBI's basis for asserting them.[31]

## II

■ Exemption 1 of the Freedom of Information Act protects from disclosure information that is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and [is] in fact properly classified pursuant to such Executive order."[32] An agency may invoke this exemption only if it complies with classification procedures established by the relevant executive order and withholds only such material as conforms to the order's substantive criteria for classification.[33] Appellant challenges, on substantive and not procedural grounds, the propriety of the classification decisions underlying the FBI's Exemption 1 claims.[34]

## A.

Both appellant and the FBI believe that the directive pertinent to disposition of the Exemption 1 issues in this case is Executive Order 12065,[35] which was in effect when the FBI's classification determinations were made.[36] This order provided that information could be classified only if it concerned:

---

**25.** *Id.* at 289–292.

**26.** *Id.* at 292–296. The court similarly sustained the INS withholding claim under Exemption 7(D).

**27.** Brief for Appellant at 7–18.

**28.** *Id.* at 18.

**29.** See *Pratt v. Webster,* 218 U.S.App.D.C. 17, 29–30, 673 F.2d 408, 420–421 (1982); Brief for Appellant at 18.

**30.** Brief for Appellant at 23–37.

**31.** See note 190 *infra* and accompanying text.

**32.** 5 U.S.C. § 552(b)(1) (1982).

**33.** *Lesar v. United States Dep't of Justice,* 204 U.S.App.D.C. 200, 211, 636 F.2d 472, 483 (1980); *Ray v. Turner,* 190 U.S. App.D.C. 290, 298, 587 F.2d 1187, 1195 (1978); *Halperin v. Department of State,* 184 U.S.App.D.C. 124, 128, 565 F.2d 699, 703 (1977).

**34.** Brief for Appellant at 8.

**35.** 43 Fed.Reg. 28949 (1978).

**36.** Brief for Appellant at 7–8; Brief for Appellee at 10 n. 4 (citing *Lesar v. United States Dep't of Justice, supra* note 33, 204 U.S.App.D.C. at 208, 636 F.2d at 480).

(a) military plans, weapons, or operations;

(b) foreign government information;

(c) intelligence activities, sources or methods;

(d) foreign relations or foreign activities of the United States;

(e) scientific, technological, or economic matters relating to the national security;

(f) United States Government Programs for safeguarding nuclear materials or facilities; or

(g) other categories of information which are related to national security and which require protection against unauthorized disclosure as determined by the President, by a person designated by the President pursuant to Section 1–201, or by an agency head.[37]

Executive Order 12065 further specified that information concerning any of the enumerated matters was eligible for classification as "confidential," the lowest security designation, only if its "unauthorized disclosure ... reasonably could be expected to cause at least identifiable damage to the national security."[38] It also established a presumption against classification: "If there is reasonable doubt ... whether the

information should be classified at all ... the information should not be classified."[39]

Subsequent to the decision to classify the documents involved in this case, and after commencement of this litigation, President Reagan promulgated Executive Order 12356.[40] This order retains all categories of classifiable information enumerated in Executive Order 12065,[41] but diverges from that order in several other significant respects. The new executive order eliminates the prior order's presumption against classification[42] and modifies the standard for classifying information. While the earlier order prohibited an agency from classifying information unless it could be shown that "unauthorized disclosure reasonably could be expected to cause at least identifiable damage to the national security,"[43] the new order seemingly commands classification of all material within certain enumerated categories of sensitive information whose "unauthorized disclosure, either by itself or in the context of other information, reasonably could be expected to cause damage to the national security."[44] While the old executive order in some instances required declassification decisions to be made by weighing the need to protect in-

---

**37.** Exec. Order No. 12065, § 1–301, 43 Fed.Reg. at 28951.

**38.** *Id.* § 1–104, 43 Fed.Reg. at 28950. A document might be classified as "secret" only if its "unauthorized disclosure ... reasonably could be expected to cause serious damage to the national security," *id.* § 1–103, 43 Fed.Reg. at 28950, and as "top secret" only if its "unauthorized disclosure ... reasonably could be expected to cause exceptionally grave damage to the national security." *Id.* § 1–102, 43 Fed.Reg. at 28950.

**39.** *Id.* § 1–101, 43 Fed.Reg. at 28950.

**40.** 47 Fed.Reg. 14873 (1982).

**41.** The new executive order also creates three additional categories of classifiable information. See Exec.Order No. 12356, § 1.3(a)(2), (8), (9), 47 Fed.Reg. at 14876.

**42.** Section 1.1(c) of the new order instead provides that "[i]f there is reasonable doubt about the need to classify information, it shall be safeguarded as if it were classified pending a determination by an original classification authority, who shall make this determination with-

in thirty (30) days." 47 Fed.Reg. at 14875. Cf. text *supra* at note 39. Additionally, § 1.3(a), (b) would appear to make classification of all potentially damaging information falling within the specified categories mandatory, see 47 Fed. Reg. at 14876, whereas classification was discretionary under Executive Order 12065, see Exec. Order No. 12065, §§ 1–301, 1–302, 43 Fed.Reg. at 28951.

**43.** Exec.Order No. 12065, § 1–302, 43 Fed.Reg. at 28951.

**44.** Exec.Order No. 12356 § 1.3(b), 47 Fed.Reg. at 14876. Section 1–303 of Exec.Order No. 12065, 43 Fed.Reg. at 28952, announces a presumption that unauthorized disclosure of foreign-government information or the identity of confidential foreign sources would cause the requisite degree of damage to the national security; § 1.3(c) of Exec.Order No. 12356, 47 Fed.Reg. at 14876, extends this presumption to intelligence sources and methods of information as well. See generally *Powell v. United States Dep't of Justice*, 584 F.Supp. 1508, 1516–1517 (N.D.Cal.1984) (construing presumptions as rebuttable, not conclusive).

formation against the public interest in disclosure,[45] the new executive order eliminates this balancing provision from the declassification calculus.[46] Absent as well from the new order are certain procedures contained in Executive Order 12065 designed to ensure systematic declassification review of older material.[47]

The parties have conformed their arguments regarding the propriety of the classification decisions in dispute to the terms of Executive Order 12065, under which those decisions were made,[48] notwithstanding the fact that Executive Order 12065 is now superseded by Executive Order 12356. Their position finds support in our holding in *Lesar v. United States Department of Justice*[49] that "[o]n review, the court should ... assess the documents according to the terms of the Executive Order under which the agency made its ultimate classification determination."[50] A brief review of the rationale supporting our position in *Lesar* and its subsequent elaboration should provide a framework for an assessment of the Exemption 1 claims in this case.

Our decision in *Lesar* to utilize the terms of a superseded order as the basis for review was explicitly bottomed on considerations of efficiency and, properly understood, is limited to the situations in which efficiency can be pursued with due regard for the national security considerations of paramount concern in Exemption 1 cases. As we observed in *Lesar*, Executive Order

12065 provided that information classified under prior orders should retain its classified status;[51] this carry-over provision enabling a reviewing court to analyze a disputed classification decision under the order in effect at the time the decision was made, in lieu of a remand to the agency for a fresh classification at each juncture of the litigation marked by a new executive order.[52] "To hold otherwise and require a remand whenever a new Executive Order issued during the pendency of an appeal would not only place a heavy administrative burden on the agencies but would also cause additional delays in the ultimate processing of these types of FOIA requests."[53]

In *Afshar v. Department of State*,[54] we revisited the question from a somewhat different vantage point. We there considered the question, which we had no occasion to address in *Lesar*, of which executive order an agency should be directed to apply when the case is remanded with instructions to reconsider a faulty classification determination, and from this perspective we discerned limits to the principle announced in *Lesar*. While an executive order's carry-over provision might enable review of a classification decision under the terms of the order in force at the time the decision was made, a remand with an instruction to the agency to reconsider the decision under the terms of a then superseded order would impermissibly bind the Government in an area where flexibility

45. Exec.Order No. 12065, § 3–303, 43 Fed.Reg. at 28955.

46. See *Afshar v. Department of State*, 226 U.S. App.D.C. 388, 398, 702 F.2d 1125, 1135 (1983).

47. Compare Exec.Order No. 12065, § 3–4, 43 Fed.Reg. at 28955–28956, with Exec.Order No. 12346, § 3.3, 47 Fed.Reg. at 14879. Compare also the slight shift in emphasis between the declassification policy set forth in Exec.Order No. 12065, §§ 3–301, 3–302, 43 Fed.Reg. at 28955, and that of Exec.Order No. 12346, § 3.1(a), 47 Fed.Reg. at 14878.

48. See note 36 *supra* and accompanying text.

49. *Supra* note 33.

50. 204 U.S.App.D.C. at 208, 636 F.2d at 480; see also *id.* ("a reviewing court should assess classi-

fication under the Executive Order in force at the time the responsible official finally acts").

51. *Id.* See Exec.Order No. 12065, § 6–102, 43 Fed.Reg. 28961. Cf. Exec.Order No. 12356, § 6.1(c), 47 Fed.Reg. 14883 (national security information includes information found under current or predecessor orders to require protection).

52. *Lesar v. United States Dep't of Justice, supra* note 33, 204 U.S.App.D.C. at 208, 636 F.2d at 480.

53. *Id.*

54. *Supra* note 46.

and responsiveness to changing world circumstances are at a premium.[55]

▮ Together, then, *Lesar* and *Afshar* direct a reviewing court to assess the propriety of a classification decision purportedly supporting an Exemption 1 claim in terms of the executive order in force at the time the agency's ultimate classification decision is actually made. Only when a reviewing court contemplates remanding the case to the agency to correct a deficiency in its classification determination is it necessary to discriminate between the order governing for purposes of review and any that may have superseded it, to ensure that on remand the agency will comply only with the most current executive assessment of the Nation's security needs.[56] This two-tiered scheme of review harmonizes the interest in speedy disposition of FOIA requests with that of preserving flexibility in national security determinations. For present purposes, it identifies Executive Order 12065, in force at the time the challenged classification decisions were made, as the directive governing review of the Exemption 1 issues raised in this case.

**B.**

▮ Turning to the general principles affecting this appeal, we begin with a reminder that, as in all FOIA cases, the district courts are to review de novo all exemption claims advanced,[57] and that the agency bears the burden of justifying its decision to withhold requested information.[58] The agency may meet this burden by filing affidavits describing the material withheld and the manner in which it falls within the exemption claimed;[59] and the court owes substantial weight to detailed agency explanations in the national security context.[60] However, a district court may award summary judgment to an agency invoking Exemption 1 only if (1) the agency affidavits describe the documents withheld and the justifications for nondisclosure in enough detail and with sufficient specificity to demonstrate that material withheld is logically within the domain of the exemption claimed,[61] and (2) the affidavits are neither controverted by contrary record evidence nor impugned by bad faith on the part of the agency.[62] On appeal, the

---

55. 226 U.S.App.D.C. at 399–400, 702 F.2d at 1136–1137.

56. In the present case, it appears that the FBI never sought permission to review its classification determinations under Executive Order 12356 while the case was pending before the District Court; nor has it suggested to this court that there are any differences in the terms of the two orders that would affect its classification determinations were the case remanded to it for reconsideration. See note 36 *supra* and accompanying text, and note 135 *infra*.

57. 5 U.S.C. § 552(a)(4)(B) (1982); see *Miller v. Casey*, 235 U.S.App.D.C. 11, 14, 730 F.2d 773, 776 (1984) (Exemption 1); *Military Audit Project v. Casey*, 211 U.S.App.D.C. 135, 149, 656 F.2d 724, 738 (1981) (same); *Ray v. Turner, supra* note 33, 190 U.S.App.D.C. at 297, 587 F.2d at 1194 (same).

58. 5 U.S.C. § 552(a)(4)(B) (1982); see *Miller v. Casey, supra* note 57, 235 U.S.App.D.C. at 14, 730 F.2d at 776; *Military Audit Project v. Casey, supra* note 57, 211 U.S.App.D.C. at 149, 656 F.2d at 738; *Ray v. Turner, supra* note 33, 190 U.S. App.D.C. at 297, 587 F.2d at 1194.

59. *Military Audit Project v. Casey, supra* note 57, 211 U.S.App.D.C. at 149, 656 F.2d at 738; *Lesar v. United States Dep't of Justice, supra* note 33, 204 U.S.App.D.C. at 209, 636 F.2d at 481; *Hay-*

*den v. National Sec. Agency*, 197 U.S.App.D.C. 224, 230, 608 F.2d 1381, 1387 (1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980); *Ray v. Turner, supra* note 33, 190 U.S.App.D.C. at 298, 587 F.2d at 1195.

60. See S.Rep. No. 1200, 93d Cong., 2d Sess. 12 (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News 6267, 6290. *Miller v. Casey, supra* note 57, 235 U.S.App.D.C. at 14, 730 F.2d at 776; *Weissman v. CIA*, 184 U.S.App.D.C. 117, 122–123, 565 F.2d 692, 697–698 (1977).

61. *Miller v. Casey, supra* note 57, 235 U.S.App.D.C. at 14, 730 F.2d at 776; *Lesar v. United States Dep't of Justice, supra* note 33, 204 U.S.App.D.C. at 209, 636 F.2d at 481; *Hayden v. National Sec. Agency, supra* note 59, 197 U.S.App.D.C. at 230, 608 F.2d at 1387; *Ray v. Turner, supra* note 33, 190 U.S.App.D.C. at 298, 587 F.2d at 1195; *Weissman v. CIA, supra* note 60, 184 U.S.App.D.C. at 122–123, 565 F.2d at 697–698; *Vaughn v. Rosen, supra* note 16, 157 U.S.App.D.C. at 347, 484 F.2d at 827.

62. *Miller v. Casey, supra* note 57, 235 U.S.App.D.C. at 14, 730 F.2d at 776; *McGehee v. CIA*, 225 U.S.App.D.C. 205, 222, 697 F.2d 1095, 1112 (quoting *Military Audit Project v. Casey, supra* note 57, 211 U.S.App.D.C. at 149, 656 F.2d at 738), *vacated in part*, 229 U.S.App.D.C. 148, 711 F.2d 1076 (1983); *Salisbury v. United States*, 223

court is to determine, from inspection of the agency affidavits submitted, whether the agency's explanation was full and specific enough to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding. "Once we are satisfied that [the affidavits provided] the trial court ... an adequate basis to decide, we are guided by the 'clearly erroneous' standard in evaluating the substance of that decision." [63]

The significance of agency affidavits in a FOIA case cannot be underestimated. As, ordinarily, the agency alone possesses knowledge of the precise content of documents withheld,[64] the FOIA requester and the court both must rely upon its representations for an understanding of the material sought to be protected. As we observed in *Vaughn v. Rosen*,[65] "[t]his lack of knowledge by the party seeing [*sic*] disclosure seriously distorts the traditional adversary nature of our legal system's form of dispute resolution," [66] with the result that "[a]n appellate court, like the trial court, is completely without the controverting illumination that would ordinarily accompany a lower court's factual determination." [67] Even should the court undertake in camera inspection of the material—an unwieldy process where hundreds or thousands of pages are in dispute— [68] "[t]he scope of the inquiry will not have been focused by the adverse parties...." [69]

Affidavits submitted by a governmental agency in justification for its exemption claims must therefore strive to correct, however, imperfectly, the asymmetrical distribution of knowledge that characterizes FOIA litigation. The detailed public index which in *Vaughn* [70] we required of withholding agencies is intended to do just that: "to permit adequate adversary testing of the agency's claimed right to an exemp-

U.S.App.D.C. 243, 247, 690 F.2d 966, 970 (1982); *Gardels v. CIA*, 223 U.S.App.D.C. 88, 93, 689 F.2d 1100, 1105 (1982) (citing *Halperin v. CIA, supra* note 33, 203 U.S.App.D.C. 110, 114, 629 F.2d 144, 148 (1980)).

63. *Church of Scientology v. United States Dep't of the Army*, 611 F.2d 738, 743 (9th Cir.1979); accord *Kiraly v. FBI*, 728 F.2d 273, 277 (6th Cir.1984). In *Mead Data Cent. v. United States Dep't of the Air Force*, 184 U.S.App.D.C. 350, 566 F.2d 242 (1977), we observed that a FOIA requester seeking appellate reversal of a decision sustaining an agency's withholding claims must show either (1) "that it was deprived of the opportunity to effectively present its case to the court because of the agency's inadequate description of the information withheld and exemptions claimed" or (2) that "the trial judge ... incorrectly decided that the requested information was exempt." *Id.* at 359, 566 F.2d at 251. "In order to show that the district court's decision was incorrect as a substantive matter, [the requester] must establish that it was either based on an error of law or a factual predicate which is clearly erroneous." *Id.* at 359 n. 13, 566 F.2d at 251 n. 13.

64. See *Vaughn v. Rosen, supra* note 16, 157 U.S.App.D.C. at 343–344, 484 F.2d at 823–824.

65. *Supra* note 16.

66. 157 U.S.App.D.C. at 344, 484 F.2d at 824.

67. *Id.* at 345, 484 F.2d at 825.

68. The decision to conduct an in camera examination is discretionary, *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224, 98 S.Ct. 2311, 2318, 57 L.Ed.2d 159, 167 (1978); *Meeropol v. Meese*, 252 U.S.App.D.C. 381, 397, 790 F.2d 942, 958 (1986); *Center for Auto Safety v. EPA*, 235 U.S.App.D.C. 169, 173–174, 731 F.2d 16, 20–21 (1984); *Allen v. CIA*, 205 U.S.App.D.C. 159, 168–171, 636 F.2d 1287, 1296–1299 (1980) (considerations bearing on resort to in camera inspection), and generally it is unfeasible for the court to undertake this task where a large number of documents are involved, see *Church of Scientology v. IRS*, 253 U.S.App.D.C. 78, 85, 792 F.2d 146, 153 (1986), *supp. op.*, 253 U.S.App.D.C. 85, 792 F.2d 153 (*en banc* 1986), *cert. granted,* —— U.S. ——, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987); *Weisberg v. Department of Justice*, 240 U.S.App. D.C. 339, 353, 745 F.2d 1476, 1490 (1984); see also *Center for Auto Safety v. EPA, supra*, 235 U.S.App.D.C. at 177 n. 10, 731 F.2d at 24 n. 10 (discussing considerations of judicial economy); cf. *Lykins v. Department of Justice*, 233 U.S.App. D.C. 349, 357, 725 F.2d 1455, 1463 (1984) (even where available, "*in camera* examination is not a substitute for the government's obligation to provide detailed public indexes and justifications whenever possible").

69. *Vaughn v. Rosen, supra* note 16, 157 U.S.App. D.C. at 345, 484 F.2d at 825; accord *Phillippi v. CIA*, 178 U.S.App.D.C. 243, 247, 546 F.2d 1009, 1013 (1976).

70. *Vaughn v. Rosen, supra* note 16, 157 U.S.App. D.C. at 346–348, 484 F.2d at 826–828.

tion," [71] and enable "the District Court to make a rational decision whether the withheld material must be produced without actually viewing the documents themselves, as well as to produce a record that will render the District Court's decision capable of meaningful review on appeal." [72] Thus, when an agency seeks to withhold information, it must provide "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." [73] Specificity is the defining requirement of the *Vaughn* index and affidavit; [74] affidavits cannot support summary judgment if they are "conclusory, merely reciting statutory standards, or if they are too vague or sweeping." [75] To accept an inadequately supported exemption claim "would constitute an abandonment of the trial court's obligation under the FOIA to conduct a *de novo* review." [76]

## C.

The District Court examined the affidavits submitted by the FBI in the instant case, and concluded that they substantiated its reliance on Exemption 1. [77] On appeal, then, we are to determine as a threshold matter whether the affidavits in fact provided the District Court with "an adequate basis to decide" the Exemption 1 issues: [78] to ascertain whether the material withheld is within the categories of classifiable information enumerated in Executive Order 12065 and, further, whether its unauthorized disclosure reasonably could be expected to cause the requisite amount of damage to the national security. [79] We turn to the *Vaughn* index and the accompanying declaration prepared by Special FBI Agent, Richard C. Staver. [80]

Staver advised the District Court that "[t]o provide a more workable '*Vaughn* index' format and thus reduce the burden of analyzing Exemption One claims" he was departing from the practice of preparing typed pages separately describing each withheld document, and was submitting instead copies of the documents released pursuant to appellant's FOIA demand with each deletion annotated by means of a four-character code referring in turn to an accompanying code-catalogue. [81] The copy

**71.** *NTEU v. United States Customs Serv.,* 255 U.S.App.D.C. 449, 451, 802 F.2d 525, 527 (1986).

**72.** *Dellums v. Powell,* 206 U.S.App.D.C. 383, 392, 642 F.2d 1351, 1360 (1980).

**73.** *Mead Data Cent. v. United States Dep't of the Air Force, supra* note 63, 184 U.S.App.D.C. at 359, 566 F.2d at 251. Cf. *Paisley v. CIA,* 229 U.S.App.D.C. 372, 376 n. 12, 712 F.2d 686, 690 n. 12 (1983) ("[t]he index consists of one document that adequately describes each withholding record or deletion and sets forth the exemption claimed and why that exemption is relevant"), *vacated in part on other grounds,* 233 U.S.App.D.C. 69, 724 F.2d 201 (1984).

**74.** See *Gardels v. CIA, supra* note 62, 223 U.S.App.D.C. at 93, 689 F.2d at 1105; *Allen v. CIA, supra* note 68, 205 U.S.App.D.C. at 164–165, 636 F.2d at 1292–1293; *Halperin v. CIA, supra* note 62, 203 U.S.App.D.C. at 114, 629 F.2d at 148; *Hayden v. National Sec. Agency, supra* note 59, 197 U.S.App.D.C. at 230, 608 F.2d at 1387; *Ray v. Turner, supra* note 33, 190 U.S.App.D.C. at 298, 587 F.2d at 1195; *Vaughn v. Rosen, supra* note 16, 157 U.S.App.D.C. at 347, 484 F.2d at 827.

**75.** *Allen v. CIA, supra* note 68, 205 U.S.App.D.C. at 163, 636 F.2d at 1291 (quoting *Hayden v.*

*National Sec. Agency, supra* note 59, 197 U.S.App.D.C. at 230, 608 F.2d at 1387); accord *Center for Auto Safety v. EPA, supra* note 68, 235 U.S.App.D.C. at 175, 731 F.2d at 22; *Goland v. CIA,* 197 U.S.App.D.C. 25, 37–38, 607 F.2d 339, 351–352 (1978), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

**76.** *Allen v. CIA, supra* note 68, 205 U.S.App.D.C. at 165, 636 F.2d at 1293 (Exemption 1).

**77.** *King v. United States Dep't of Justice, supra* note 2, 586 F.Supp. at 291–292.

**78.** *Church of Scientology v. United States Dep't of the Army, supra* note 63, 611 F.2d at 738; see note 63 *supra* and accompanying text.

**79.** Exec.Order No. 12065, §§ 1–1, 1–3, 43 Fed. Reg. 28950, 28951–28952; see *Baez v. United States Dep't of Justice,* 208 U.S.App.D.C. 199, 205, 647 F.2d 1328, 1334 (citing *Lesar v. United States Dep't of Justice, supra* note 33, 204 U.S.App.D.C. at 209, 636 F.2d at 481).

**80.** Staver-Scheuplein Declaration, *supra* note 9, at 1–33, R. 16; see note 19 *supra.*

**81.** Staver-Scheuplein Declaration, *supra* note 9, at 8, R. 16.

of the redacted documents and the explanatory code-catalogue together comprise the FBI's *Vaughn* filing.

In brief, the system works as follows. For every instance in which information was withheld, the documents released have been marked with the four-character code. The first two characters of the code identify the FOIA exemption assertedly authorizing the withholding—for example, (b)(1); the third character identifies the category in Executive Order 12065 under which the material has been classified—such as Section 1–301(c) (intelligence activities, sources or methods); and the fourth character refers to a statement in the code-catalogue that is offered as a description of the material withheld, intended to demonstrate that it lies within one or more of the classification categories of Executive Order 12065, and to point to the likely harm to the national security attending its release.[82] In sum, the District Court was presented with an intensively redacted and annotated 1500–page reproduction of the requested file, as well as numerous inserts, similarly annotated, representing the remaining 165 pages of the file withheld.[83]

■ Staver opines that this new method of presentation represents "a vast improvement over previous formats" and that "the required specificity has been enhanced."[84] We regret to differ. The system Staver has adopted imposes a significant burden upon the reviewing court without commensurate benefit. Staver's system of annotation neither adequately describes redacted material nor explains, with sufficient specificity to enable meaningful review, how its disclosure would likely impair national security.[85]

First, as a practical matter we note that neither the declaration preamble nor the catalogue proffered for descriptive purposes corollates discussion of national security concerns to redacted documents.[86] Lacking citations within the declaration to point a reader and the court to the documents in question at each stage of the

---

82. The FBI has advanced Exemption 1 claims for three categories of classifiable information under Executive Order 12065: § 1–301(b) (foreign government information); § 1–301(c) (intelligence activities, sources or methods); and § 1–301(d) (foreign relations or foreign activities of the United States). Staver-Scheuplein Declaration, *supra* note 9, at 12, R. 16. The code-catalogue usually offers a 1½ page description of the types of information comprehended by each executive order category, with each then broken down into one to four descriptive subcategories keyed by the fourth character of the coding system. The category of foreign government information is divided into two descriptive subcategories (information identifying a foreign government engaged in a cooperative relation with the United States, and information provided by a foreign government with the expectation, express or implied, that it is to be kept in confidence); the category of intelligence activities, sources, or methods is severed into four descriptive subcategories (three on sources, pertaining to information that could identify a source, source identifiers, and source contact dates, and one on information pertaining to an intelligence activity or method). The category of foreign relations or activities of the United States is treated in one descriptive subcategory. *Id.* Each descriptive subcategory provides a brief account of the type of information included, and a several-sentence discussion of the nexus between disclosure of that subcategory of information and damage to the national security. It then refers the reader to a 1½ page account of the damage to the national security expected to result from unauthorized disclosure of material in that general category of classifiable information. See *id.* at 13–33, R. 16.

83. See text *supra* at note 14.

84. Staver-Scheuplein Declaration, *supra* note 9, at 8, R. 16.

85. See text *supra* at notes 64–76.

86. Cf. *Dellums v. Powell, supra* note 72, 206 U.S.App.D.C. at 392, 642 F.2d at 1360 ("for purposes of correlating claims, defenses, and privileges to manageable segments of the transcripts, [the *Vaughn* index] should identify all relevant portions of the transcripts by page number and line, so that all claims and objections can be fully evaluated and reviewed"); *Mead Data Cent. v. United States Dep't of Air Force, supra* note 63, 184 U.S.App.D.C. at 359, 566 F.2d at 251 ("[t]hus, we require that when an agency seeks to withhold information it must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of the withheld document to which they apply"); *Vaughn v. Rosen, supra* note 16, 157 U.S.App.D.C. at 347, 484 F.2d at 827 (recommending indexing "system that would correlate statements made in the Government's refusal justification with the actual portions of the document") (footnote omitted).

declaration's exposition, the coding system shifts a sizable portion of the agency's admittedly imposing burden onto the shoulders of the court.[87] In order to weigh the declarant's arguments, or those offered by counsel in briefs, the court must sift through all of the documents—here 1,500 pages—to find those in issue. To proceed under the alternate strategy—reading the redacted documents and following the code annotations back to the catalogue provided—illuminates the fundamental deficiency of the index format the FBI has adopted. Because it is unhelpfully categorical in nature, the coded commentary supplies little information beyond that which can be gleaned from context.

Apparently the FBI is of the opinion that, by submitting to the court a reproduction of the redacted file, it is relieved of the obligation of describing withheld material in detail.[88] Utilization of reproductions of material released to supply contextual information about material withheld is clearly permissible, but caution should be exercised in resorting to this method of description. Such a system is only as good as its results, and the vital result must be an adequate representation of context which, when combined with descriptions of dele-

tions, enables de novo review of the propriety of withholding. In the present case, the system is inadequate because we are left with no contextual description for documents or substantial portions of documents withheld in their entirety,[89] an impermissible result as long as revelation of the context would not itself harm the national security. Furthermore, a reproduction of the redacted documents can only show the court the context from which an item has been deleted, and context may or may not assist the court in assessing the character of the excised material and the grounds for its deletion.[90] Where it does not, the coded commentary to which the system of annotation leads the court is so general in nature as to be of little or no help.

To carry its burden of demonstrating the propriety of the classification decisions supporting its Exemption 1 position, the FBI must describe with reasonable specificity the material withheld, and identify the damage to the national security expected to attend its disclosure.[91] The declaration's far-ranging category definitions for information classifiable under Executive Order 12065[92] make clear that the FBI could pro-

---

**87.** Cf. *Ray v. Turner, supra* note 33, 190 U.S. App.D.C. at 307, 587 F.2d at 1204 (concurring opinion); *Weissman v. CIA, supra* note 60, 184 U.S.App.D.C. at 123, 565 F.2d at 698; *Vaughn v. Rosen, supra* note 16, 157 U.S.App.D.C. at 345–346, 484 F.2d at 825–826.

**88.** See Staver-Scheuplein Declaration, *supra* note 9, at 9 R. 16.

**89.** See, for example, the instances cited in note 131 *infra.*

**90.** Contextual information cannot, for instance, answer questions of the following order. Is an intelligence source whose name has been excised still alive? Has that source been otherwise identified in the decades since the report was filed? Would information deleted on the theory that it might identify a source still do so forty years after the fact? Is a particular intelligence method or activity still in use? If not, what concerns warrant continuing protection for information on intelligence methods and activities from the 1940's? See text *infra* at notes 124–135.

**91.** Exec.Order No. 12065, §§ 1–301, 1–302, 43 Fed.Reg. 28951. To demonstrate that material withheld under the cloak of Exemption 1 has

been properly classified within the terms of Executive Order 12065, the FBI must demonstrate by affidavit, not only that the material falls within the enumerated categories of classifiable information, but also that unauthorized disclosure "reasonably could be expected to cause at least identifiable damage to the national security." See text *supra* at notes 37–38.

**92.** For example, information concerning intelligence activities, sources, and methods, § 1–301(c), is defined to encompass:

Information that could reveal or identify a present, past or prospective intelligence source, whether a person, organization, group, technical system, mechanism or device that provides, has provided or is being developed to provide foreign intelligence or foreign counterintelligence.

Information which could reveal or identify a present, past or prospective intelligence method, procedure, mode, technique or requirement used or being developed to acquire, transmit, analyze, correlate, evaluate or process foreign intelligence or foreign counter-intelligence or to support an intelligence source, operation or activity.

Information that could disclose the identities of Intelligence Community agency person-

vide subcategory descriptions of redacted material in far more detail than it has.[93] Staver's account of consequences likely to follow disclosure of the information in question is similarly deficient, presenting myriad damage possibilities for each category of classifiable information.[94] The ac-

> nel operating under cover or of code or numerical designations used to protect such personnel or intelligence sources, methods and activities.
>
> Information pertaining to intelligence-related methodologies, techniques, formulae, equipment, programs or models, including computer simulations, ranging from initial requirements through planning, source acquisition, contract initiation, research, design and testing to production, personnel training and operational use.
>
> Information that could identify research procedures or data used in the acquisition and processing of foreign intelligence or counter intelligence or the production of finished intelligence, when such identification could reveal a particular intelligence interest, the value of the intelligence or the extent of knowledge of a particular subject of intelligence or counter intelligence interest.
>
> Information that could reveal, jeopardize or compromise a technical or mechanical device, procedure or system used or proposed for the collection of intelligence information, or the sites, facilities, equipment, systems operational schedules and technologies used or proposed for use in such collection or in the interpretation, evaluation and dissemination of collected information.
>
> An intelligence activity, source or method requiring classification has two general characteristics. First, the intelligence activity, source or method and information generated by it is needed by the FBI to carry out its mission. Second, confidentiality must be maintained with respect to the activity, source or method and information provided by it, if its viability, productivity and the usefulness of its information is to be preserved.

Staver-Scheuplein Declaration, *supra* note 9, at 19–20, R. 16.

93. For instance, the declaration offers only one subcategory account of "intelligence methods or activit[ies]," providing the following description of the information withheld under this code category:

> Specific information about or from an intelligence activity and/or method can reflect upon United States intelligence gathering capabilities—its strengths and weaknesses. The FBI engages in intelligence activities and utilizes intelligence methods to fulfill responsibilities imposed upon it by law in the intelligence and counterintelligence field. This information encompasses assessments of intelligence source penetration into particular areas of intelligence interest; evaluation of information developed by means of intelligence activities; assessment of the impact of availability or non-availability of intelligence

> sources and methods targeted against suspected espionage apparatuses.

Staver-Scheuplein Declaration, *supra* note 9, at 29, R. 16. This refinement of the declaration's wide-ranging category description, see note 92 *supra*, is of no assistance whatsoever.

94. For example, the declaration supplies the following account of the damage to the national security reasonably expected to result from unauthorized disclosure of information concerning intelligence, activities, sources or methods:

> Disclosure of information concerning intelligence activities, sources or methods can result in damage to the national security in several ways. First, its disclosure could reveal the existence of a particular intelligence or counterintelligence investigation/operation. Disclosure could reveal or indicate the nature, objectives, requirements, priorities, scope or thrust of the intelligence or counterintelligence investigation. Disclosure could identify data used in the acquisition and processing of intelligence or counterintelligence information and such identification could reveal a particular intelligence interest, the value of the intelligence, or the extent of knowledge of a particular target of intelligence or counterintelligence interest. Disclosure could reveal a particular method utilized to obtain or process intelligence or counterintelligence information. Such disclosure would allow hostile entity assessment of both general and specific intelligence collection capabilities during a particular time frame, and hostile assessment of areas and targets which had been compromised or not compromised; allow countermeasures to be implemented, making future intelligence operations more difficult; and compromise other ongoing and planned intelligence operations.
>
> Disclosure of this category of information can also lead to exposure of intelligence sources. Exposure of an intelligence source can result in termination of the source; discontinuance of the source's services; exposure of other ongoing intelligence gathering activities; modification or cancellation of future intelligence gathering activities, permitting hostile entities to evaluate the number and objectives of intelligence sources targeted against them, and take appropriate countermeasures; and an overall chilling effect on the climate of cooperativeness with respect to intelligence sources, both current and prospective, not willing to risk the probability of exposure with its potential effect of possible loss of life, jobs, friends, status, etc., all of which may reasonably be expected to hamper intelligence collection ability and result in identifiable damage to the national security.

count of the "logical nexus between disclosure ... and damage to the national security" supplied for each subcategory of redacted information [95] does little to correct this deficiency because it, too, is categorical in nature.[96]

We emphasize that our dissatisfaction with the FBI's Exemption 1 showing arises from the character of the *Vaughn* index tendered. We express no view on the validity of the underlying classification decisions it is intended to justify. Indeed, we are in no position to evaluate those decisions—to ascertain, for example, whether sensitivity of intelligence information withheld has in any respect diminished with the passage of time [97]—for the simple reason that we are not furnished with sufficient information to do so in a meaningful fashion. In decoding the redaction annotations, one encounters at every turn general, not particularized, response. And the generality of the declaration's subcategory description seems to result, not from cautious avoidance of revealing descriptive detail, but rather from the wide-ranging coverage of the subcategory description itself.[98] Similarly, every account the declaration offers of consequences of disclosing material withheld assumes the form of a list whose serial alternatives reflect, not predictive uncertainty about such consequences, as much as the broad contours of the categorization scheme employed.[99] Clearly, a series of discrete declassification decisions was necessary to prepare the King file for release, but the texture of these deliberations is everywhere effaced by the coding system employed to justify them to the court.

■ The *Vaughn* index here submitted is, in a word, inadequate—wholly lacking in that specificity of description we have repeatedly warned is necessary to ensure meaningful review of an agency's claim to withhold information subject to a FOIA request.[100] A withholding agency must describe *each* document or portion thereof withheld, and for *each* withholding

---

Staver-Scheuplein Declaration, *supra* note 9, at 21, R. 16.

**95.** See note 82 *supra.*

**96.** For instance, the declaration's subcategory description of information "Pertaining To Or Provided By An Intelligence Source That Could Reasonably Be Expected To Identify The Source If Disclosed," Staver-Scheuplein Declaration, *supra* note 9, at 22, R. 16, incorporates by reference the category description of harm quoted in note 94 *supra,* and then provides the following account of the nexus between disclosure and damage to the national security:

Information of this category is either specific in nature or of a unique character, and thereby could lead to the identification of the source. For example, this information may contain details obtained from a one-on-one conversation between a source and another individual. It may be of such *detail that it* pinpoints a critical time frame or reflects a special vantage point from which the source was reporting. The information may be more or less taken verbatim from a source's report and thus reveal a style of reporting peculiar to that source along with other clues as to authorship. The nature of the information may be such that only a handful of parties would have access to it. In sum it is the degree of specificity of this information that endangers the source's continued anonymity. It is in my determination that disclosure of this information would enable a hostile analyst to unravel the cloak of secrecy that protects the intelli-

gence source's identity. Thus exposed the source's effectiveness would be terminated and in my judgment such occurence could reasonably be expected to cause at least identifiable damage to the national security.
Staver-Scheuplein Declaration, *supra* note 9, at 22–23, R. 16.

**97.** See text *infra* at notes 124–135.

**98.** See, e.g., notes 92–93 *supra.*

**99.** The declaration's account of the nexus between disclosure of "intelligence method or activity information," category (b)(1)–(C)(4), and damage to the national security consists in the observation that the information sought "is specific" and "therefore[ ] its disclosure would automatically reveal to a hostile intelligence analyst United States intelligence capabilities in a particular area." Staver-Scheuplein Declaration, *supra* note 9, at 29, R. 16. The reader is then referred to a far-reaching discussion of the risks of disclosing "intelligence sources, methods and activities" information, quoted in full at note 94 *supra,* whose first paragraph is apparently intended to supply the requisite account of likely harm. The account of the nexus between disclosure of intelligence source information, category (b)(1)–(C)(1), and damage to the national security quoted in full at note 96 *supra,* is similarly categorical in tenor.

**100.** See text *supra* at notes 64–76.

it must discuss the consequences of disclosing the sought-after information. This requirement, if indeed not explicit in *Vaughn,* is unmistakably implicit in the principles supporting our decision in that case, as our subsequent decisions have made very clear. When, in *Vaughn,*[101] we first insisted that agencies tender an index and affidavits as a precondition to review of exemptions claims, we emphasized the necessity of identifying which exemption was relied upon for each item withheld.[102] In *Mead Data Central v. United States Department of the Air Force,*[103] we elaborated on *Vaughn's* requirements, explaining that the withholding agency must supply "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply."[104] As we subsequently reiterated in *Dellums v. Powell,*[105] *Vaughn's* call for specificity imposes on the agency the burden of demonstrating applicability of the exemptions invoked *as to each document or segment withheld.*[106] Elsewhere we have defined the *Vaughn* index as "consist[ing] of one document that adequately describes each withheld record or deletion and sets forth the exemption claimed and why that exemption is relevant."[107] Categorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate.[108] To support its Exemption 1 claims, the agency affidavits must, for each redacted document or portion thereof, (1) identify the document, by type and location in the body of documents requested; (2) note that Exemption 1 is claimed; (3) describe the document withheld or any redacted portion thereof, disclosing as much information as possible without thwarting the exemption's purpose; (4) explain how this material falls within one or more of the categories of classified information authorized by the governing executive order; and (5) explain how disclosure of the material in question would cause the requisite degree of harm to the national security.

■ As we noted in *Dellums,* a system for categorizing Exemption 1 claims may be appropriate, particularly where the documents in question are voluminous and the same exemption applies to a large number of segments.[109] The availability of categorization does not, however, supplant the demand for particularity.[110] When the above-listed factors are identical for several documents withheld or items redacted, a single representation, accompanied by identifying references to the documents or portions at issue, may suffice. Similarly, a coding system might be employed to indicate applicability of a given response to more than one segment of redacted material, so long as the information supplied remains responsive to each deleted segment without becoming categorial in tenor. As to each item of excised material, the agency, of course, is to provide as much information

---

**101.** *Supra* note 16.

**102.** 157 U.S.App.D.C. at 347, 484 F.2d at 827.

**103.** *Supra* note 63.

**104.** 184 U.S.App.D.C. at 359, 566 F.2d at 251.

**105.** *Supra* note 72. Although *Dellums v. Powell* was not a FOIA case, we required submission in that case of an affidavit and index comporting with *Vaughn.* 206 U.S.App.D.C. at 387, 642 F.2d at 1355 (noting that procedures of *Nixon v. Sirica,* 159 U.S.App.D.C. 58, 79, 487 F.2d 700, 721 (1973), i.e., submittal of a *Vaughn* index, had been ordered); see also *McGehee v. CIA, supra* note 62, 225 U.S.App.D.C. at 209 n. 12, 697 F.2d at 1099 n. 12 (FOIA case relying on *Dellums* for a "description of what such such an index entails").

**106.** *Dellums v. Powell, supra* note 72, 206 U.S. App.D.C. at 392–393 & n. 29, 642 F.2d at 1360–1361 & n. 29; accord *Founding Church of Scientology v. Bell,* 195 U.S.App.D.C. 363, 367, 603 F.2d 945, 949 (1979) ("index must state the exemption claimed for each deletion or withheld document, and explain why the exemption is relevant").

**107.** *Paisley v. CIA, supra* note 73, 229 U.S.App. D.C. at 376 n. 12, 712 F.2d at 690 n. 12.

**108.** *Dellums v. Powell, supra* note 72, 206 U.S. App.D.C. at 392–393 n. 29, 642 F.2d at 1360–1361 n. 29.

**109.** *Id.*

**110.** *Id.*

as is consistent with the national security interests Exemption 1 is designed to protect.[111]

To be avoided at all costs is "an exercise in the jurisprudence of labels ... offer[ing] conclusory assertions regarding [documents] that are not susceptible to such simplistic classification." [112] As we warned in *Dellums,* the goal of descriptive accuracy is not to be sacrificed to the niceties of a particular classification scheme.[113] The measure of a *Vaughn* index is its descriptive accuracy, and we are willing to accept innovations in its form so long, but only so long, as they contribute to that end.

### D.

We conclude that the *Vaughn* index tendered in this case provides an insufficient basis for the de novo review that FOIA mandates for Exemption 1 claims.[114] This requires a remand of the case to the District Court for further proceedings. Then, the court may employ any of several measures to acquire enough information to conduct the review requisite.

The District Court may, in its discretion, order production of the excised material or some sample thereof for in camera inspection.[115] An opportunity for "first-hand inspection [enables the court to] determine whether the weakness of the affidavits is a result of poor draftsmanship or a flimsy exemption claim," but "the district court's inspection prerogative is not a substitute for the government's burden of proof, and should not be resorted to lightly." [116] Moreover, should the task of in camera examination appear too burdensome, the court may allow appellant to engage in further discovery,[117] or order the FBI to supplement its *Vaughn* filings.[118] If so ordered, the FBI must to provide on an item-specific basis the maximum amount of information consistent with protection of the interests of national security [119] and the exigencies of forecasting events in this domain.[120]

Whether the District Court proceeds by ordering supplemental affidavtis or by in camera inspection of documents or samplings, it must ensure that it has an adequate foundation for review of the FBI's

111. Cf. *Phillippi v. CIA, supra* note 69, 178 U.S. App.D.C. at 247, 546 F.2d at 1013.

112. *Dellums v. Powell, supra* note 72, 206 U.S. App.D.C. at 392–393 n. 29, 642 F.2d at 1360–1361 n. 29.

113. It is worth recalling our observation in *Dellums* that "the effort to categorize [may be] inappropriate ... because of the unsuitability of the materials for such classification ...," and our rejection of an indexing method resulting in "conclusory assertions" about material "not susceptible to such simplistic classification." *Id.*

114. See notes 63, 67 *supra* and accompanying text; see also *Allen v. CIA, supra* note 68, 205 U.S.App.D.C. at 164, 636 F.2d at 1292 (rejecting as "defective" CIA affidavits which "do not permit a trial court to conclude that the document was classified in conformity with the substantive requirements of Executive Order 12065").

115. See *Meeropol v. Meese, supra* note 68, 252 U.S.App.D.C. at 397, 790 F.2d at 958 (in camera review appropriate where agency submissions are inadequate); *Baez v. United States Dep't of Justice, supra* note 79, 208 U.S.App.D.C. at 206, 647 F.2d at 1335 (same); see also *Meeropol v. Meese, supra* note 68, 252 U.S.App.D.C. at 397–399, 790 F.2d at 958–960 (discussing sampling procedures); *Weisburg v. Department of Justice, supra* note 68, 240 U.S.App.D.C. at 353, 745 F.2d

at 1490 (same); *Ash Grove Cement Co. v. FTC,* 167 U.S.App.D.C. 249, 251, 511 F.2d 815, 817 (1975). We note that in the decision here appealed from the court rejected this method. *King v. United States Dep't of Justice, supra* note 2, 586 F.Supp. at 289.

116. *Church of Scientology v. United States Dep't of the Army, supra* note 63, 611 F.2d at 743 (citations omitted); see also note 68 *supra.*

117. The District Court also denied appellant's motion to compel production and answers to interrogatories. *King v. United States Dep't of Justice, supra* note 2, 586 F.Supp. at 289.

118. See *Paisley v. CIA, supra* note 73, 229 U.S. App.D.C. at 386, 712 F.2d at 700 (alternatives available to District Court on FOIA remand).

119. See *Phillipi v. CIA, supra* note 69, 178 U.S. App.D.C. at 247, 546 F.2d at 1013 (even where court employs in camera inspection, agency's public affidavits must be as detailed as possible to ensure issues before court are focused and clarified by adversary process).

120. See *Gardels v. CIA, supra* note 62, 223 U.S. App.D.C. at 94, 689 F.2d at 1106; *Halperin v. CIA, supra* note 62, 203 U.S.App.D.C. at 115–116, 629 F.2d at 149–150.

withholding claims before giving the agency's expert opinion on national security matters the substantial weight to which it is entitled.[121] At a minimum, the court must secure more information with respect to excisions involving whole documents or substantial parts thereof, where no contextual information is available to supplement and particularize the FBI's code descriptions.[122] Having garnered this additional information on material withheld, the court should then scrutinize afresh the FBI's assessment of the consequences of disclosure, allowing appropriate latitude for opinion [123] but ensuring that the enumeration of alternate consequences presently characterizing the agency's submission reflects predictive uncertainty rather than mere categorical response.

■ In reviewing the FBI's predictions on disclosure, the court should devote particular attention to the age of the file in this case. It was compiled between 1941 and 1952; all documents it contains are now at least 35 years old. Executive Order 12065 directs declassification "as early as national security considerations permit," [124] and identifies "the occurrence of a declassification event" or "loss of the information's sensitivity with the passage of time" as

circumstances sufficient to warrant dissolution of a prior classification determination.[125] The order's declassification policy is buttressed by a scheme of mandatory declassification review, concerned especially with material classified in excess of twenty years.[126] In light of this policy, the District Court clearly erred in simply deferring to the FBI's judgment that the sensitivity of the information withheld had not diminished with age,[127] particularly since the agency's only commentary remotely responsive to this concern was its averment that declassification decisions were made in procedural conformity with Executive Order 12065's directives on prolonged classification.[128] An assurance of *procedural* compliance does not, by itself, afford an adequate foundation for de novo review of the *substantive* propriety of the withholdings in question; [129] in the present case, it raises as many question as it answers. To cite but one example, the Staver-Scheuplein declaration avers that classification was conducted in accordance with FBI implementing regulations, providing in part that category 1–301(c) information on intelligence activities, sources and methods presumptively requires classification for a period extending up to twenty years.[130] The

---

121. *Halperin v. CIA, supra* note 62, 203 U.S.App. D.C. at 114, 629 F.2d at 148; see note 60 *supra* and accompanying text.

122. Cf. *Lamont v. Department of Justice,* 475 F.Supp. 761, 771–773 (S.D.N.Y.1979) (denying summary judgment on Exemption 1 defense and requiring in camera inspection "where entire documents or substantial parts thereof have been withheld . . . ," on grounds that agency affidavits lacked sufficient description to demonstrate that each withheld document fell within executive order categories claimed).

123. See *Halperin v. CIA, supra* note 62, 203 U.S.App.D.C. at 115–116, 629 F.2d at 149–150.

124. Exec.Order No. 12065, § 3–301, 43 Fed.Reg. at 28955 (according declassification "emphasis comparable to that accorded classification").

125. *Id.* The order expressly provides that review of material subject to a FOIA request should result in declassification "unless . . . the information continues to meet the classification requirements in Section 1–3 despite the passage of time." *Id.* at § 3–302, 43 Fed.Reg. at 28955.

126. See *id.* at § 3–4, 43 Fed.Reg. at 28955–28956.

127. See *King v. United States Dep't of Justice, supra* note 2, 586 F.Supp. at 292.

128. See Staver-Scheuplein Declaration, *supra* note 9, at 3–6, R. 16. The declaration's coded commentary is otherwise silent with respect to questions of the documents' age; indeed, it consistently describes redacted material and discusses the consequences of disclosure as though the files were only recently compiled. See, e.g., notes 92, 93, 94, 96 *supra.*

129. See *Lesar v. United States Dep't of Justice, supra* note 33, 204 U.S.App.D.C. at 213, 636 F.2d at 485 (FOIA "requires both procedural and substantive conformity for proper classification").

130. In pertinent part, the FBI Foreign Counter Intelligence Manual at II, 1–2.4.2, as quoted in the Staver-Scheuplein Declaration, *supra* note 9, at 4 n. 5, R. 16, states:

. . . It is anticipated that the activities, sources and methods will continue to warrant protection beyond six years and since no specific date is predictable when protection will not be warranted, classification is extended up to

FBI has nevertheless withheld whole documents and passages on the theory that they contain information capable of identifying an intelligence source, leaving us with no contextual information on their general contents and no hint as to why classification of the material was extended

20 years. Declassification prior to that time could inhibit ongoing collection of intelligence information, jeopardize identities of sensitive sources and expose valuable methods of gathering intelligence data to the detriment of our counterintelligence mission.

**131.** See, e.g., Exhibit A to Staver-Scheuplein Declaration, *supra* note 9, Document No. 9 at 1–2, R. 16 (dated Aug. 18, 1942) (classification decision finalized Nov. 19, 1981); *id.,* Document No. 31 and enclosure, R. 16 (dated Dec. 27, 1943) (classification decision finalized Nov. 19, 1981); *id.,* Document No. 51 at 1–3 (dated Mar. 17, 1945) (classification decision finalized Nov. 19, 1981); *id.,* Document No. 68 at 1–2 (dated Feb. 17, 1948) (classification decision finalized Nov. 19, 1981); *id.,* Document No. 87 at 2 (dated Apr. 14, 1951) (classification finalized Nov. 19, 1981).

Among the assurances of procedural compliance offered by the declaration is the statement that each document containing classified information twenty years or older was referred to the Department of Justice for review by the Attorney General to determine whether continued classification despite the passage of time was warranted. Declarant Staver reports, in an appended footnote that "[i]n this regard I was advised [that the Department] determined that the 20 year old or older information contained in the documents addressed by this declaration continued to warrant classification despite the passage of time. I was further advised that the date of declassification review for this information should be established at 10 years." Staver-Scheuplein Declaration, *supra* note 9, at 6 & n. 9, R. 16. *No further explanation or elaboration appears in the declaration.*

**132.** For example, in *Powell v. United States Dep't of Justice, supra* note 44, a recent case involving a FOIA request for McCarthy-era FBI investigative files, the court held that the age of the classified information in contention (from 22 to 35 years old) tended to rebut any presumption of damage to the national security from its release, and required the agency in its *Vaughn* submissions to address the significance of the documents' age. The *Vaughn* index initially proffered was judged unacceptable for this purpose because it failed "to address the crucial questions of whether each particular intelligence source is still alive, is still functioning as a source, has already been revealed, or can possibly be identified by places, dates, capability, or *other information supplied thirty years* after the fact." 584 F.Supp. at 1517. In light of

decades beyond the period the agency's own regulations presumptively deem necessary.[131] Before a court can accord the deference due the FBI's considerable expertise on this question, the agency must impart a fair understanding of its reasoning on an item-specific basis.[132] In light of

the inadequacy of the agency's affidavits, the court concluded that in camera inspection was warranted, and decided to inspect a sample and delegate the remainder of the task, with detailed instructions, to a special master. *Id.* at 1515. From all appearances, the *Vaughn* index submitted in *Powell* is substantially similar in format to that in issue here. Cf. *id.* at 1513–1514 (describing characteristics of index format and concluding that "[t]he FBI's 'coded approach to the *Vaughn* index' is little better than the conclusory and generalized allegations of exemption which *Vaughn* disapproved") with Staver-Scheuplein Declaration, *supra* note 9, at 8, 9, R. 16 (discussing the "coded approach to the *Vaughn* index" followed in the submission in the instant case).

In *Dunaway v. Webster,* 519 F.Supp. 1059 (N.D.Cal.1981), another case involving a FOIA request for FBI investigative files compiled during the McCarthy period, the court found the FBI's Exemption 1 affidavits lacking in specificity, focusing particularly on the agency's failure to address the age of the classified documents—this "in light of the clear policy favoring declassification in Executive Order 12065." *Id.* at 1069. It undertook to inspect the documents in camera, and concluded that this exercise did little ... to dispel the court's doubts. Most of the information concerns the comings and goings of United States citizens 20 to 30 years ago, as well as the accumulation of general information on the activities of various organizations in this country which were considered subversive at that time. Virtually all of the information is of the most mundane character, information which has no apparent relationship to the security of this nation today, if it ever had.... Many of the organizations spied on are defunct, many are no longer considered a security risk, and many of the individuals involved are dead. Without some evidence from the government that would suggest to this court that the sources revealed in these documents are of continuing use to the United States for national security purposes, this court cannot find any basis for believing that this information, if disclosed, could reasonably be expected to have any identifiable damage on our national security. *Id.* at 1070. The court thus rejected most of the Exemption 1 claims asserted, suspending release of the information long enough to give the agency an opportunity to raise alternative exemption claims. *Id.* at 1071.

its claimed reliance on a codified policy respecting declassification of older documents, the FBI is under a particular obligation to account for its apparently continuing decision to prolong classification of those documents whose age exceeds the periods deemed presumptively appropriate for classification by its own regulations.[133] On the basis of that showing [134] the court will then, and only then, be in position to determine whether, in light of the facts arrayed before it, the Exemption 1 claims can be sustained.[135]

## III

Exemption 7 of the Freedom of Information Act, in its provisions pertinent here, excuses from disclosure

records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, [or] (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.... [136]

**133.** As we explained in *Vaughn*, the agency's duty to produce detailed affidavits arises from FOIA and is necessary to effectuate the de novo review mandated by the Act. Once a withholding agency details the basis of its claims, presumptions embodied in the governing executive order and any implementing regulations—or for that matter their underlying policy regarding declassification of older materials—must be taken into account in reviewing the agency's claims, but not before. We think it crucial at all points to distinguish between an agency's FOIA obligations to make public so far as possible the basis for its classification decisions, on the one hand, and, on the other, review of the classification decisions themselves. It is primarily at this latter stage that the terms of the governing executive order will come into play.

In the instant case, the FBI must address the age of the documents in the *King* file on an item-specific basis in any further *Vaughn* filings; it would, of course, do well to discharge this obligation with special care where its declassification decisions stand in apparent conflict with policies embodied in the executive order and implementing regulations governing review in this case.

**134.** Should the court be inclined to proceed by supplemental affidavits rather than in camera inspection, a rebuttal showing by appellant may be appropriate.

**135.** In this regard, as in all others, the District Court should assess the sufficiency of the FBI's index and affidavit, as well as any supplemental filing, by the terms of the executive order and implementing regulations in force at the time the Bureau made its ultimate classification decisions. Should the court undertake in camera inspection, it should apply the same standard. See *Lesar v. United States Dep't of Justice, supra* note 33, 204 U.S.App.D.C. at 208, 636 F.2d at 480. Should, however, the court direct the FBI

to reassess any of the underlying classification decisions at issue, it must afford it an opportunity to conduct its deliberations under the executive order currently in force. See *Afshar v. Department of State, supra* note 46, 226 U.S.App. D.C. at 399–400, 702 F.2d at 1136–1137; *text supra* at notes 48–56; accord *Meeropol v. Meese, supra* note 68, 252 U.S.App.D.C. at 399, 790 F.2d at 960. The court is not, however, obliged to remand to the agency for reclassification purposes simply by virtue of the change in effective executive orders. See *Afshar v. Department of State, supra note* 46, 226 U.S.App.D.C. at 399–400 n. 18, 702 F.2d at 1137–1138 n. 18 (discussing "policy enunciated in *Lesar* and avoiding a remand just because a new Executive Order is issued during an appeal"); *Lesar v. United States Dep't of Justice, supra* note 33, 204 U.S.App.D.C. at 208, 636 F.2d at 480.

At no juncture in this litigation has the FBI indicated any difference in the terms of the two orders, see note 36 *supra* and accompanying text; text *supra* at note 48, or any change in national security circumstances, see *Baez v. United States Dep't of Justice, supra* note 79, 208 U.S.App.D.C. at 204–205, 647 F.2d at 1333–1334, that would affect the underlying classification decisions in dispute, nor do the character and age of the file here in question suggest they should. Nevertheless, should the District Court forego the task of reviewing classification decisions the FBI has already made and direct the agency itself to review those decisions substantively, it should afford the FBI an opportunity to do so under the terms of the current order. See *Afshar v. Department of State, supra* note 46, 226 U.S.App.D.C. at 399–400, 702 F.2d at 1136–1137.

**136.** 5 U.S.C. § 552(b)(7) (1982) (as amended by Freedom of Information Reform Act of 1986, Pub.L. No. 99–570, subtit. N, § 1802, 100 Stat.

To justify a withholding under Exemption 7, an agency must demonstrate, as a threshold matter, that the information it seeks to shield has been " 'compiled for law enforcement purposes' " [137] and, further, that production would have one of the undesirable effects enumerated by the exemption.[138]

## A.

In this circuit, as we have recently observed, "FBI records are not law enforcement records [under FOIA] simply by virtue of the function that the FBI serves." [139] Rather, our decision in *Pratt v. Webster* [140] supplies a two-prong test for determining whether a law-enforcement agency invoking Exemption 7 has made even the threshold showing requisite.[141] *Pratt* requires,

first, that the agency "identify a particular individual or a particular incident as the object of its investigation" and specify " 'the connection between that individual or incident and a possible security risk or violation of federal law.' " [142] The agency must then demonstrate that this relationship is "based on information sufficient to support at least a 'colorable claim' of the connection's rationality." [143] This inquiry, while "necessarily deferential,"

is not vacuous. In order to pass the FOIA Exemption 7 threshold, ... an agency must establish that its investigatory activities are realistically based on a legitimate concern that federal laws have been or may be violated or that national security may be breached. Either of these concerns must have some plausible

3207, 3207–48, 3207–49 (1986)). The 1986 amendments to Exemption 7 clearly govern this appeal. Section 1804(a) of the Reform Act provides that "[t]he amendments made by section 1802 shall be effective on the date of enactment of this Act [October 27, 1986], and shall apply with respect to any requests for records, whether or not the request was made prior to such date, and shall apply to any civil action pending on such date." *Id.* § 1804(a), 100 Stat. 3250.

137. *FBI v. Abramson,* 456 U.S. 615, 622, 102 S.Ct. 2054, 2059, 72 L.Ed.2d 376, 384 (1982) (quoting 5 U.S.C. § 552(b)(7) (1982)); *Shaw v. FBI,* 242 U.S.App.D.C. 36, 40, 749 F.2d 58, 62 (1984); *Pratt v. Webster, supra* note 29, 218 U.S.App.D.C. at 22, 23–25, 673 F.2d at 413, 414–416.

138. *FBI v. Abramson, supra* note 137, 456 U.S. at 622, 102 S.Ct. at 2059, 72 L.Ed.2d at 384; *Pratt v. Webster, supra* note 29, 218 U.S.App.D.C. at 22, 673 F.2d at 413.

139. *Vymetalik v. FBI,* 251 U.S.App.D.C. 402, 407, 785 F.2d 1090, 1095 (1986).

140. *Supra* note 29.

141. Congress' recent action amending Exemption 7 in no measure qualifies the authority of *Pratt.* As the history of the 1986 legislation makes clear, Congress did nothing with respect to the threshold showing of law-enforcement purpose that *Pratt* elaborates. The report of the Senate Judiciary Committee on S. 774, 98th Cong., 1st Sess. (1983), stated that the amendment "does not affect the threshold question of whether 'records or information' withheld under (b)(7) were 'compiled for law enforcement purposes.' This standard would still have to be satisfied in order to claim the protection of the (b)(7) exemption." S.Rep. No. 221, 98th Cong.,

1st Sess. 23 (1983), *reprinted in relevant part in,* 132 Cong.Rec. H9466 (daily ed. Oct. 8, 1986) (joint statement of Representatives English and Kindness) (citing *FBI v. Abramson, supra* note 137). S. 774 passed the Senate, but was not acted on by the House during the 98th Congress; however, § 10 of the bill, without any change pertinent here, supplied the language for the 1986 amendments to Exemption 7, and the Senate Judiciary Committee's report on § 10 of S. 774 was explicitly adopted by both the Senate and the House sponsors of those amendments. 132 Cong.Rec. S14296 (daily ed. Sept. 30, 1986) (statement of Senator Leahy) (adopting S.Rep. No. 221 as "set[ting] out the legislative history which should be consulted to determine the scope of the section we are adopting in this bill"); 132 Cong.Rec. H9465–H9466 (daily ed. Oct. 8, 1986) (joint statement of Representatives English and Kindness) (same). Cf. *Reporters' Comm. for Freedom of the Press v. United States Dep't of Justice,* 259 U.S.App.D.C. 426, 433 n. 10, 816 F.2d 730, 737 n. 10 (1987).

142. *Shaw v. FBI, supra* note 137, 242 U.S.App.D.C. at 41, 749 F.2d at 63 (quoting *Pratt v. Webster, supra* note 29, 218 U.S.App.D.C. at 29, 673 F.2d at 420); *Founding Church of Scientology v. Levi,* 579 F.Supp. 1060, 1062–1063 (D.D.C.1982), *aff'd,* 232 U.S.App.D.C. 167, 721 F.2d 828 (1983). This test affords greater deference to the agency's own characterization of the investigation than would be summoned if the agency were not one "whose principal function is criminal law enforcement." *Pratt v. Webster, supra* note 29, 218 U.S.App.D.C. at 25, 673 F.2d at 416.

143. *Shaw v. FBI, supra* note 137, 242 U.S.App.D.C. at 41, 749 F.2d at 63 (quoting *Pratt v. Webster, supra* note 29, 218 U.S.App.D.C. at 30, 673 F.2d at 421).

basis and have a rational connection to the object of the agency's investigation.[144]

Thus, *Pratt* in no wise requires a court to sanction agency claims that are pretextual or otherwise strain credulity.[145] As we have explained, the threshold showing required by *Pratt* is an "objective" one, and "suffices to establish the exemption only if it is unrefuted by persuasive evidence that in fact another, nonqualifying reason prompted the investigation," as "for example [where an investigation is conducted] for purposes of harassment."[146]

In the present case, the FBI supplied the following description of the investigation for which the sought-after documents were compiled:

Carol King is the subject of FBIHQ "main" file 100–49864, which is comprised of 1,665 pages. This file is an Internal Security investigative file compiled for law enforcement purposes pursuant to Title 18, U.S.C., Section 2383 (Rebellion or Insurrection), formerly codified as Title 18, U.S.C., Section 4 (1940 ed.), originally enacted as Act of March 4, 1909, ch. 31, Section 4, 35 Stat. 1088; Title 18, U.S.C., Section 2384 (Seditious Conspiracy), formerly codified as Title 18, U.S.C., Section 5 (1940 ed.), originally enacted as Act of March 4, 1909, ch. 321, Section 6, 35 Stat. 1089; Title 18 U.S.C., Section 2385 (Overthrow of the Government), formerly codified as Title 18, U.S.C., Sections 10, 11 and 13 (1940 ed.), originally enacted as the Alien Registration Act of 1940, ch. 439, Title I, Sections 2, 3 and 5, 54 Stat. 670, 671. This investigation was opened in 1941 and closed in 1952 after the death of Carol King.[147]

This account clearly identifies Carol King as the target of the investigation but, to specify the "connection between [her] and a possible security risk or violation of federal law,"[148] it simply recites the criminal statutes pursuant to which the investigation was undertaken, presumably indicating that somewhere within the parameters of those general provisions were criminal acts that the FBI suspected her of committing. The FBI, however, contended before the District Court that it had adequate grounds to investigate Carol King in that "Mrs. King was in close association with individuals and organizations that were of investigative interest to the FBI,"[149] asserting that the redacted files released to appellant, together with appellant's own submissions, provided sufficient evidence of such associations to support its claim of law-enforcement purpose.[150]

Appellant has endeavored to controvert the FBI's claim on two grounds. First, appellant supplied a series of affidavits attesting to Carol King's character and beliefs, which were intended to demonstrate that "Carol King did not engage in any of the activities proscribed by the three statutes and that at no time did there exist any ground upon which the FBI could reasonably have suspected that she might have engaged in such activities."[151] Second, appellant launched a broader attack on the propriety of the FBI's investigation, inti-

144. *Pratt v. Webster, supra* note 29, 218 U.S.App. D.C. at 30, 673 F.2d at 421.

145. *Shaw v. FBI, supra* note 137, 242 U.S.App.D. C. at 41, 749 F.2d at 63; *Pratt v. Webster, supra* note 29, 218 U.S.App.D.C. at 30, 673 F.2d at 421 (citing *Abramson v. FBI,* 212 U.S.App.D.C. 58, 63, 658 F.2d 806, 811 (1980), *rev'd on other grounds,* 456 U.S. 615, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1986)).

146. *Shaw v. FBI, supra* note 137, 242 U.S.App.D. C. at 41–42, 749 F.2d at 63–64.

147. Staver-Scheuplein Declaration, *supra* note 9, at 35, R. 16 (footnote omitted).

148. See note 142 *supra* and accompanying text.

149. Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's "Motion for Summary Judgment, or, in the Alternative, to Compel Answers to Interrogatories and Response to Request for Production of Documents" and in Further Support of Defendant's Motion for Summary Judgment at 10, *King v. United States Dep't of Justice,* Civ. No. 81–1485 (D.D.C.) (filed Dec. 17, 1982), R. 33 (footnotes omitted).

150. *Id.*

151. Plaintiff's Motion for Summary Judgment, *supra* note 7, at 29, *King v. United States Dep't of Justice,* (Civ. No. 81–1485 (D.D.C.) (filed Oct. 14, 1982), R. 26A; see also *id.,* Exhibits A–I, R. 26A.

mating that the inquiry was calculated to impair Carol King's efficacy in defending clients whose deportation the Government sought. Surveillance of Carol King, appellant speculates, may have been calculated to secure informational advantage in the litigation of individual cases,[152] and to harass and intimidate Carol King in her work as defense counsel generally.[153]

 On cross-motions for summary judgment, the District Court held that the FBI had satisfied *Pratt's* threshold showing of law-enforcement purpose.[154] Upon inspection, we find this ruling supported by the record. *Pratt* counsels against "second-guessing" a law-enforcement agency's showing of investigatory purpose if there is a plausible basis for the undertaking.[155]

Heeding this admonition, the District Court could properly have concluded that the evidence on Carol King's character did not, by itself, impugn the plausibility of an investigation premised on the character of her associations. While a factual dispute foreclosing summary judgment would have developed had appellant appropriately buttressed her allegation that a strategem of harassment motivated the investigation, that charge remained wholly devoid of support in the record. In making out a case of pretext, the burden of rebutting an agency showing of law-enforcement purpose rests on the FOIA plaintiff.[156] Yet, so far as we can determine, appellant proffered no evidence to support her claim that the investigation of Carol King was undertaken for impermissible reasons.[157] Without such ev-

**152.** *Id.* at 30 n. 26, R. 26A.

**153.** Appellant asserted that the FBI's surveillance included "tapping [Carol King's] telephone both at home and office, having her followed by FBI agents, having several agents, in at least one instance known to [appellant], stationed in the hall outside her office and on the street in front of her home, and even breaking into her office and photographing her correspondence." *Id.* at 31, R. 26A. This course of conduct was likely designed to harass Carol King, appellant reasons:

> Certainly Carol King and many who dealt with her were aware of the FBI's constant surveillance, for much of it was conducted in the open with the apparent purpose of disturbing her professional relationships by impeding communications between her clients and associates and herself. At one point she complained to the telephone company that the noise from the wiretaps made it difficult to carry on conversations, and she had to resort to meeting clients in city parks and subways to avoid the FBI agents who not infrequently hung around her office.

*Id.* at 34 n. 31, R. 26A.

**154.** *King v. United States Dep't of Justice, supra* note 2, 586 F.Supp. at 293–294.

**155.** *Pratt v. Webster, supra* note 29, 218 U.S.App. D.C. at 30, 673 F.2d at 421 ("in order to carry out its functions, [a law-enforcement agency] often must act upon unverified tips and suspicions based upon mere tidbits of information. A court, therefore, should be hesitant to second-guess a law enforcement agency's decision to investigate if there is a plausible basis for its decision").

**156.** See *Shaw v. FBI, supra* note 137, 242 U.S. App.D.C. at 41–42, 749 F.2d at 63–64.

**157.** Appellant might have underpinned her allegation of harassment or intimidation by exhibiting evidence of two types. First, appellant might have substantiated allegations in her briefs, see note 153 *supra;* Brief for Appellant at 22–23 n. 15, that the surveillance of Carol King was so intrusive in nature as to justify an inference that harassment or intimidation was its object. Despite anecdotal allusions peppering appellant's briefs, no such evidence was revealed to the District Court. Appellant's single, unelaborated averment that "Carol King was aware that she was subjected to constant observation as a result of her serving as counsel for unpopular clients," Exhibit J to Plaintiff's Motion for Summary Judgment, *supra* note 7, at 6, R. 26A, surely cannot support an inference of deliberate vexation. Alternatively, appellant might have bolstered her allegations with direct evidence of impermissible motive. But, aside from some suggestion in the released files that the FBI debated whether to continue surveillance of Carol King, see Brief for Appellant at 20 n. 13—again, a mere hint which, standing alone, hardly demonstrates illicit purpose—appellant proffered no direct evidence of motive to back up her allegations of impropriety.

Appellant did bring to the District Court's attention several unanswered interrogatories bearing directly on the question of motive, arguing in the alternative to her motion for summary judgment that should the Exemption 7 claims proceed to trial, the FBI should be compelled to respond. See Plaintiff's Motion for Summary Judgment, *supra* note 7, at 31–35, R. 26A (contending that responses to such questions were relevant and neither burdensome nor privileged). But appellant never represented to the court by means of the affidavit required by Fed.R.Civ.P. 56(f) that discovery of such material was essential to advance an issue of material fact sufficient to withstand the FBI's motion for

idence, the District Court properly ruled, on the cross-motion for summary judgment, that the record presented no factual issue respecting a law-enforcement purpose stemming from the association that Carol King maintained. We therefore turn to examine the Exemption 7 claims asserted here.

## B.

■ The FBI withheld portions of the King file on the ground that they are protected from disclosure by Exemption 7(C) and (D).[158] The material retained was indexed by use of a code catalogue similar to that employed by the FBI in its effort to vindicate its withholding under Exemption 1. Notwithstanding the deficiencies of this descriptive format in the Exemption 1 context,[159] we find that it supplies the information requisite for de novo review of the Exemption 7 claims. The latter exemption, in relevant part, concerns issues of privacy and confidentiality arising from the involvement of discrete classes of persons in law-enforcement investigations. The indexing system in question classifies and describes the interests of such persons with sufficient specificity to convey an adequate understanding of the character of the material withheld as well as the justification advanced for withholding.[160]

Exemption 7(C) immunizes from disclosure records incorporating information gathered for law-enforcement purposes to the extent that its release would "constitute an unwarranted invasion of personal

summary judgment on the Exemption 7 claims. See *id.* at 4–5, R. 26A. We note that appellant initially submitted a Rule 56(f) affidavit to secure discovery in the case, see Affidavit Pursuant to Rule 56(f), *King v. United States Dep't of Justice,* Civ. No. 84–1485 (D.D.C.) (filed Mar. 30, 1982), R. 19A. But, when, more than six months later, appellant opposed the FBI's motion for summary judgment and herself moved for summary judgment, seeking in the alternative an order compelling response to remaining discovery items, she did not invoke the protection of the original 56(f) motion. At this time, appellant neither submitted a new 56(f) affidavit, nor provided the court like notice in lieu of the affidavit requisite. Advertence to unsatisfied discovery demands in a motion to compel advanced in the alternative to a motion for summary judgment did not impart to the court the notice contemplated by Rule 56(f). Indeed, if appellant made any representation at all to the court respecting a connection between discovery and summary judgment, it was that the record was adequate for such a ruling. See Plaintiff's Motion for Summary Judgment, *supra* note 7, at 4–5, R. 26A. In these circumstances, appellant forfeited any opportunity to have the court consider additional material, production of which might properly have been compelled prior to a ruling on the Exemption 7 claims. See *Shavrnoch v. Clark Oil & Ref. Corp.,* 726 F.2d 291, 294 (6th Cir.1984); *Pasternak v. Lear Petroleum Exploration, Inc.,* 790 F.2d 828, 832–833 (10th Cir.1986) (protection afforded by Rule 56(f) is an alternative to response in opposition to motion for summary judgment under Rule 56(e), and is designed to safeguard against premature grant of summary judgment) (Rule 56(f) may not be invoked by mere assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable; opposing party must demonstrate how additional time will enable him to rebut movant's allegations of no genuine issue of fact); *Weir v. Anaconda,* 773 F.2d 1073, 1082–1083 (10th Cir.1985); see also *Brae Transp., Inc. v. Cooper & Lybrand,* 790 F.2d 1439, 1443 (9th Cir.1986).

**158.** The exemption is reproduced in pertinent part in text *supra* at note 136.

**159.** See Part II(C) *supra.*

**160.** Withholding under Exemption 7(C) is sought to be justified by means of numerous descriptive subcategories which, in turn, address the privacy interests of FBI personnel, other federal employees, and state and local law-enforcement officials who participated in the investigation; of third parties who furnished information as a result of their employment with institutional sources; of third parties mentioned in FBI investigative files; of third parties who were subjects or suspects of an FBI investigative file; and of third parties who gave the FBI information. Withholding under Exemption 7(D), which pertains to matters of source confidentiality, is described in subcategories bearing on code symbols or letters used to identify confidential sources; material that might point to sources who provided the FBI with information under an express or implied assurance of confidentiality or reveal information supplied by such sources; information furnished by financial or commercial institutions; and information given by state or local law enforcement agencies or tending to identify such sources. A code catalogue entry described the privacy or confidentiality interest implicated by each class of information and detailed the FBI's ground for withholding. Staver-Scheuplein Declaration, *supra* note 9, at 38–40, R. 16; see also *id.* at 42–52, R. 16.

privacy." [161] Appellant contends that the FBI improperly invoked the exemption to withhold information that might serve to identify third parties mentioned in the FBI investigative file, third parties identified as subjects of or suspects in the FBI investigative file, and third parties who provided information to law-enforcement officials.[162]

 As the District Court correctly recognized, all three of these classes of persons have a cognizable interest in the privacy of their involvement in a law-enforcement investigation.[163] We have admonished repeatedly "that disclosing the identity of targets of law-enforcement investigations can subject those identified to embarassment and potentially more serious reputational harm," [164] and that "[o]ther persons involved in the investiation—witnesses, informants, and investigating agents—also have a substantial interest in seeing that their participation remains secret." [165] Third parties discussed in investigatory files may have a similarly strong interest in non-disclosure.[166]

Having perceived the privacy interests implicated by the King file, the District Court properly undertook to weigh those interests against the public interest in dissemination of file material.[167] Though we believe that the court underrated the public interest considerations favoring disclosure, we find correct its ultimate conclusion that the privacy interests here asserted outweigh such public benefit as might attend release of the file information in dispute.

In conducting a de novo review of Exemption 7(C) claims, the district court must "balanc[e] the privacy interest[s] at stake against the public interest in disclosure." [168] And the court must remain mindful that while, "[a]s to other exemptions, 'Congress has struck the balance and the duty of the court is limited to finding whether the material is within the defined category' ...[,] Exemption 7(C)'s balance is not similarly 'tilted emphatically in favor of disclosure.' " [169]

 Starting from the general premise that "it 'is difficult, if not impossible, to anticipate all respects in which disclosure might damage reputations or lead to personal embarrassment and discomfort,' " [170]

---

161. 5 U.S.C. § 552(b)(7)(C) (1982) (as amended by Freedom of Information Reform Act of 1986, Pub.L. No. 99–570, subtit. N, 1801, 100 Stat. 3207 (1986)).

162. Brief for Appellant at 23.

163. *King v. United States Dep't of Justice, supra* note 2, 586 F.Supp. at 294.

164. *Senate of the Commonwealth of Puerto Rico v. United States Dep't of Justice,* 823 F.2d 574, 588 (D.C.Cir.1987); see *Fund for Constitutional Gov't v. National Archives & Record Serv.,* 211 U.S.App.D.C. 267, 274–276, 656 F.2d 856, 863–865 (1981); *Baez v. United States Dep't of Justice, supra* note 79, 208 U.S.App.D.C. at 215, 647 F.2d at 1338.

165. *Senate of the Commonwealth of Puerto Rico v. United States Dep't of Justice, supra* note 164, at 588; see *Bast v. Department of Justice,* 214 U.S.App.D.C. 433, 436, 665 F.2d 1251, 1254 (1981); *Lesar v. United States Dep't of Justice, supra* note 33, 204 U.S.App.D.C. at 216, 636 F.2d at 488 ("[t]hose cooperating with law enforcement should not now pay the price of full disclosure of personal detail").

166. See, e.g., *Laborers' Int'l Union of N. Am. v. United States Dep't of Justice,* 249 U.S.App.D.C. 1, 2–3, 772 F.2d 919, 920–921 (1984); *Lesar v.*

167. See *King v. United States Dep't of Justice, supra* note 2, 586 F.Supp. at 294–295.

168. *Lesar v. United States Dep't of Justice, supra* note 33, 204 U.S.App.D.C. at 214, 636 F.2d at 486; see *Stern v. FBI,* 237 U.S.App.D.C. 302, 309, 737 F.2d 84, 91 (1984).

169. *Senate of the Commonwealth of Puerto Rico v. United States Dep't of Justice, supra* note 164, at 587 (quoting *Lesar v. United States Dep't of Justice, supra* note 33, 204 U.S.App.D.C. at 214 n. 80, 636 F.2d at 486 n. 80 and *Bast v. United States Dep't of Justice, supra* note 165, 214 U.S.App.D.C. at 436, 665 F.2d at 1254); see also *Bast v. United States Dep't of Justice, supra* note 165, 214 U.S.App.D.C. at 436, 665 F.2d at 1254 ("the 7(C) exemption recognizes the stigma potentially associated with law enforcement investigations and affords broader privacy rights to suspects, witnesses, and investigators").

170. *King v. United States Dep't of Justice, supra* note 2, 586 F.Supp. at 295 (quoting *Lesar v. United States Dep't of Justice, supra* note 33, 204 U.S.App.D.C. at 216, 636 F.2d at 488).

*United States Dep't of Justice, supra* note 33, 204 U.S.App.D.C. at 216, 636 F.2d at 488 (protecting information regarding subject's family and associates).

the District Court observed that the " 'McCarthy era' character of this investigation" strengthened the privacy interests militating against release.[171] " 'A moment's reflection upon recent political history and the excesses of the internal security investigations of the 1950's,' " the court said, " 'should be sufficient to signal caution in dealing with unverified derogatory material within the files of an intelligence gathering agency of government.' " [172] Noting further that public perception of persons thought to have engaged in "subversive" activities, as well as those thought to have associated with such persons, was subject to unpredictable swings, the court rejected appellant's argument that the passage of time diminished the privacy interests at stake.[173] We, in turn, find no basis sufficient to warrant an overturning of the court's judgment in this regard. Given the varying roles of those mentioned in the King file—ranging from investigators and informants to suspects and their associates—we view the very division and volatility of public opinion on these matters as ample reason for the degree of caution that the court exercised.[174]

Against the significant privacy interests implicated by the material in question, the District Court weighed the public interest in their disclosure. By its estimate, appellant's announced intention of using released information to prepare a biography of Carol King's life and work reflected a matter of "some public interest, although very minimal." [175] We think, to the contrary, the public value of such a work might be considerable in view of "the importance of Carol King in the legal and social controversies of her day [and] the lack of any extensive published history of the causes in which she was involved...." [176] It was, however, appellant's burden to support "adequately ... [her] 'public interest' claim with respect to the *specific* information being withheld." [177] Appellant has not attempted to demonstrate how disclosure of the identities of the specific classes of persons in issue would be of moment in preparation of her book. Indeed, she emphasizes her intention to focus the book on King's career, disavowing any "purpose to discover or write about the particular methods of surveillance that were used in Carol King's case," and addressing the FBI's investigation only to the extent "that the public be [made] aware *in general* of the consequences that defenders of unpopular causes have sometimes been made to suffer." [178] In this posture, we decline to dis-

---

171. *King v. United States Dep't of Justice, supra* note 2, 586 F.Supp. at 295.

172. *Id.* (quoting *Dunaway v. Webster, supra* note 132, 519 F.Supp. at 1079, *in turn quoting Cerveny v. CIA*, 445 F.Supp. 772, 776 (D.Colo.1978)).

173. *King v. United States Dep't of Justice, supra* note 2, 586 F.Supp. at 295.

174. In sustaining the District Court's appraisal of the privacy interests at risk, we have noted the FBI's uncontroverted representation that, to the best of its knowledge, "the (b)(7)(C) exemption was only asserted to protect those persons who are living," Staver-Scheuplein Declaration, *supra* note 9, at 42, R. 16, as well as its assertion that "[w]here information was publicly known or was innocuous, it was disclosed," *id.* at 46, R. 16.

175. *King v. United States Dep't of Justice, supra* note 2, 586 F.Supp. at 295.

176. Brief for Appellant at 34. Appellant produced a series of affidavits from associates of Carol

King, themselves persons of prominence, attesting to the importance of her contributions to the cause of equal justice in this country. See Exhibits A–I to Plaintiff's Motion for Summary Judgment, *supra* note 7.

177. *Senate of the Commonwealth of Puerto Rico v. United States Dep't of Justice, supra* note 164, at 588 (emphasis in original); accord *Bast v. United States Dep't of Justice, supra* note 165, 214 U.S.App.D.C. at 436, 665 F.2d at 1254 (in evaluating 7(C) claims, district court must "weigh[ ] the specific privacy invasion against the value of disclosing a given document") (citing *Common Cause v. National Archives & Record Serv.*, 202 U.S.App.D.C. 179, 184, 628 F.2d 179, 184 (1980)).

178. Exhibit J to Plaintiff's Motion for Summary Judgment, *supra* note 7, at 6 (emphasis added), R. 26A; see *Lamont v. United States Dep't of Justice, supra* note 122, 475 F.Supp. at 782 (sanctioning withholding where "public interest in knowing precise identities is minimal, while persons involved in or subject to the post-War hunt for alleged Communists have a privacy interest in nondisclosure").

turb the District Court's ultimate conclusion that the privacy interests asserted by the FBI in defense of withholding outweighed any public interest attending disclosure.[179]

The FBI has additionally retained material in the King file pursuant to Exemption 7(D), which safeguards from disclosure the identity of a confidential source as well as information furnished by that source.[180] The District Court sustained the FBI's Section 7(D) withholding claims in full.[181] Appellant contests the propriety of this ruling on the single ground that the evidence proffered did not show sources in fact confidential in a degree sufficient to warrant summary judgment in favor of the FBI.[182]

The District Court having, in its words, "reviewed painstakingly each of the documents"[183] for which the FBI claimed protection by Exemption 7(D), concluded that the withholding was properly supported. As to those documents marked "confidential informant" at the time of their compilation, the court found "a clear indication" in the record that express assurances of confidentiality were afforded the informants in question.[184] As to those interviews recorded in documents not so marked, the court accepted the FBI's assertion that the information they incorporated was obtained under implied assurances of confidentiality. Recalling "the tenor of the times [in which the] investigation was conducted," and placing particular emphasis upon the fact that "many of the informants were in close association with Ms. King and organizations which were of interest to the FBI,"[185] the court reasoned that this apparent conflict in allegiance presented "a circumstance from which the implied assurance of confidentiality could reasonably be inferred."[186]

Appellant would have us overturn the District Court's determinations on the theory that the court was not sufficiently skeptical about the FBI's use of the "confidential informant" label during the period when the King file was compiled; and, moreover, that it too readily inferred an expectation of confidentiality on the part of interviewees who provided the FBI with what appellant characterizes as "laudatory ... or ... innocuous" as distinguished from "accusat[ory]" information.[187] We decline to disturb the ruling in either re-

179. Cf. *Fund for Constitutional Gov't v. National Archives & Record Serv.*, supra note 164, 211 U.S.App.D.C. at 277, 656 F.2d at 866.

180. The text of the exemption is reproduced in pertinent part in text *supra* at note 136; the classes of material withheld thereunder are enumerated in note 160 *supra.*

181. *King v. United States Dep't of Justice*, supra note 2, 586 F.Supp. at 295–296.

182. Brief for Appellant at 36–37. Exemption 7(D) appears to condition any withholding of information furnished by a confidential source on a separate threshold showing. See text *supra* at note 136 ("and, in the case of a record or information compiled ... by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source"). The magnitude of this showing over and above that required by *Pratt* for Exemption 7 generally remains unsettled in this circuit. Compare *Pratt v. Webster*, supra note 29, 218 U.S.App.D.C. at 33 n. 39, 673 F.2d at 424 n. 39 with *Shaw v. FBI*, supra note 137, 242 U.S.App.D.C. at 41, 749 F.2d at 63. We do not address this important question here, for it was briefed by neither of the parties. Such briefing, we believe, is indispensable in focusing both the matters of law in issue as well as such aspects of

the record as bear on them. The FBI, which technically bears the burden of proof on this question, see 5 U.S.C. § 552(a)(4)(B) (1982), would appear to be the nominal beneficiary of our forbearance. But in view of the uncertain nature of the 7(D) showing, and appellant's failure to put the matter in issue—indeed, we understand her to challenge the withholding of confidential source information only insofar as she challenges the confidential status of the FBI's sources—see Brief for Appellant at 36–37, we see no inequity in reserving judgment until such time as the question is properly presented for decision. Cf. *Fund for Constitutional Gov't v. National Archives & Record Serv.*, supra note 164, 211 U.S.App.D.C. at 272 & n. 13, 656 F.2d at 861 & n. 13.

183. *King v. United States Dep't of Justice*, supra note 2, 586 F.Supp. at 296.

184. *Id.*

185. *Id.*

186. *Id.* This judgment comprehended as well the Exemption 7(D) withholding asserted by INS. See notes 3, 20 *supra.*

187. Brief for Appellant at 36–37.

gard. After a thorough examination of the redacted documents, the court satisfied itself that the contemporaneous identification of sources as "confidential" supplied a sound factual basis for the Exemption 7(D) claims. It is not for us to upset that conclusion where appellant can point to no countervailing record evidence that would call it into question.[188]

We view as equally ineffectual appellant's challenge to the determinations on implied assurances of confidentiality. Appellant insists that no inference of confidentiality is possible because the information provided by such sources was benign in nature. We observe first that this argument derives its impetus entirely from appellant's own characterization of the information in question, and, further, that the characterization is essentially a reflection of her skepticism of the motives and concerns animating the FBI's investigation of Carol King. Whether appellant deems the information in question "laudatory" or "innocuous," the FBI judged it to be of investigative significance at the time, and those the FBI interviewed most likely understood this. We reject the invitation to speculate about the circumstances of the interviews in question on the basis of the partisan analysis appellant offers. The District Court proceeded instead by first cultivating a vantage point contemporaneous with the interviews and then examining the relations and allegiences of those who gave the FBI information. We find this approach soundly reasoned, and, in view of the FBI's general interest in honoring source expectations of confidentiality, decline to upset the court's determinations.[189] We therefore affirm the District Court's disposition of the Exemption 7 claims, and remand the case for further proceedings on the Exemption 1 claims in accordance with this opinion.[190]

*So ordered.*

STARR, Circuit Judge, concurring in part and concurring in the judgment:

I concur in the judgment, and agree that this case can appropriately be remanded for further clarification of the Exemption 1 claims of the FBI. I also join Part III of Judge Robinson's meticulous opinion with respect to the Exemption 7 issue. I am constrained, however, not to join in the remainder of the opinion, especially to the extent that it condemns the Bureau's use of an indexing system to comply with its FOIA responsibilities.

In some respects, the explanations provided to appellant for non-production of the requested documents were arguably inadequate. In my view, the court is therefore justified in requiring the Bureau to explain more fully the bases for denying production of documents under Exemption 1. Justifying a remand are the peculiar factual circumstances of the case. In particular, the documents requested were created at least 35 years ago; some are as much as 46 years old. Appellant deserves a more detailed explanation of the agency's reasons for relying on Exemption 1 in these circumstances. Thus, I am in accord with Judge Robinson that a remand for that purpose is in order.

However, I am unable to agree with my colleague's general condemnation of the Bureau's indexing system. For one thing, I am unpersuaded that the FBI should be required to begin all over again in crafting an appropriate methodology for setting forth its legal position under Exemption 1. While reasonable minds may differ, I am satisfied that the new approach fashioned by the Bureau should, in most circumstances, pass muster, especially where voluminous documents are at issue in the most sensitive area of FOIA jurisprudence, national security. To be sure, the system could perhaps benefit from further refinement such as reducing the generality of index categories to the extent consistent with legitimate concerns over national se-

---

**188.** See *Lesar v. United States Dep't of Justice,* *supra* note 33, 204 U.S.App.D.C. at 220, 636 F.2d at 492.

**189.** See *id.* at 217–218, 636 F.2d at 489–490. We affirm as well the court's disposition of the 7(D) claim asserted by INS. See note 186 *supra.*

**190.** *See* Part II(D) *supra.*

curity. But that being said, I remain of the view that this innovation is useful and helpful; for my part, I would regret very much if it fell into disuse simply by virtue of the remand in this case.