Leslie H. WIESENFELDER, Plaintiff,

v.

Richard W. RILEY

and

The United States Department
of Education, Defendants.

Civil Action No. 95–768 SSH.

United States District Court,
District of Columbia.

Feb. 14, 1997.

Yolanda Rebecca Gallegos, Dow, Lohnes & Albertson, Washington, DC, for Plaintiff.

Elizabeth Ross Withnell, U.S. Dept. of Justice, Office of Information & Privacy, Washington, DC, for Defendants.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on defendants' motion for summary judgment, plain-

tiff's opposition thereto and cross-motion for summary judgment, defendants' opposition thereto and reply on their own motion, plaintiff's reply, and defendants' supplemental memorandum in further support of their motion. After careful consideration of the entire record, this Court grants defendants' motion for summary judgment and denies plaintiff's motion for summary judgment. Although "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56," Fed.R.Civ.P. 52(a), the Court nonetheless sets forth its analysis.

## Background

Plaintiff commenced this action pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, to obtain documents from the Department of Education (the "Department") that pertain to the Department's oversight of student financial aid programs authorized by Title IV of the Higher Education Act. 20 U.S.C. § 1070. Plaintiff seeks virtually all materials utilized by the Department in determining whether postsecondary educational institutions are in compliance with Title IV.

Title IV of the Higher Education Act authorizes loan and grant programs for eligible students in postsecondary educational institutions. Regulations enacted by the Department establish when such institutions can receive and disburse Title IV funds. See 34 C.F.R. pt. 668 (1995). The Department enacted these regulations to ensure fiscal and administrative responsibility on the part of the institutions that receive these funds. Def.s' Mot. for Summ. J. Ex. A, Fenton Decl. at §§ 17, 22–26.[1] Such regulations are necessary in light of the fact that each year over $30 billion of Title IV funds are made available by the Department. *Id.* at § 16.

On April 11, 1994, plaintiff requested the following documents:

Institutional Review Branch (IRB) procedure memoranda and deficiency codes, any other manuals, guides, procedures, or administrative directives used by program reviewers when conducting program review of postsecondary institutions that par-

ticipate in Title IV programs, a copy of the current Department of Education *Program Review Guide,* and any updates to the *Guide.*

Def.s' Statement of Material Facts as to Which There Is No Genuine Issue at 1–2; *see also* Pl.'s Resp. to Def.s' Statement of Material Facts at 1. On January 31, 1995, plaintiff requested

all documents pertaining to the standards, policies or guidelines utilized by the Department in its oversight of institutions that participate in Title IV programs, including those which address when the Department should initiate full file reviews, assess liability and/or fines, and modify the method by which the Department pays student financial assistance funds to these schools.

*Id.* at 2; *see also* Pl.'s Resp. to Def.s' Statement of Material Facts at 1. Further, on February 14, 1995, plaintiff requested all documents "pertaining to the criteria by which the Department recertifies postsecondary institutions pursuant to 34 C.F.R. § 668.13 (1994)." *Id.* at 2; *see also* Pl.'s Resp. to Def.s' Statement of Material Facts at 2.

The Department responded to plaintiff's requests on June 20, 1994, April 24, 1995, July 13, 1995, July 31, 1995, and August 16, 1995. The following documents were produced to plaintiff:

a. IRS Procedure Memoranda (86 responsive memoranda):
   - Disclosed with redactions: 64
   - Disclosed with limited redactions: 22
b. ARB Procedure Memoranda (3 responsive memoranda):
   - Disclosed without redactions: 2
   - Disclosed with limited redactions: 1
c. 1991 Program Review Guide: Nothing withheld.
d. Statistical Sampling System Users Guide: Nothing withheld.
e. Reimbursement User's Manual (55 pages): Limited redactions from pages 5, 15, 16, and 22.
f. "Determining the Amount of Fines" document (5 pages): Limited redactions on four of the five pages.
g. Deficiency Code list (10 pages): Nothing withheld.

---

1. Howard E. Fenton is the Acting Director of the Institutional Monitoring Division at the Office of Postsecondary Education at the Department of Education.

Def.s' Mot. for Summ. J. Ex. A, Fenton Decl. at ¶ 14. The Department refused to produce the redacted information, claiming that Exemption 2 of the FOIA, 5 U.S.C. § 552(b)(2), protects such information from disclosure. Plaintiff contests the Department's claimed FOIA exemption and asks the Court to compel production of the requested documents.

The Department moves for summary judgment on the ground that the redacted material is protected from disclosure pursuant to Exemption 2. The Department claims that it released the vast majority of information requested and withheld only those data that show triggers or benchmarks that signify when enforcement action may be necessary, error rates that identify the Department's tolerance for mistakes, and dollar amounts of potential fines. The Department claims that Exemption 2 protects from disclosure these three categories of information. Def.s' Mot. for Summ. J. at 10–11.

Plaintiff has filed a cross-motion for summary judgment. Plaintiff claims that the Department's responses fail to identify which documents are responsive to each of plaintiff's particular requests, fail to state that all relevant documents have been provided, and fail to state that any documents not provided fall under any of the FOIA exemptions. Mem. of P. & A. in Support of Pl's Mot. for Summ. J. and Pl's Opp. to Def's Mot. for Summ. J. at 4–5.

## Discussion

### I. Exemption 2 of the FOIA

■ Exemption 2 of the FOIA allows for the nondisclosure of material "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2) (1994). Courts have interpreted Exemption 2 to encompass two specific categories of information: (1) internal matters of a relatively trivial nature—referred to as "low 2" information; and (2) internal matters that are more substantial, the disclosure of which

would risk circumvention of the law—referred to as "high 2" information. See Schiller v. NLRB, 964 F.2d 1205, 1207 (D.C.Cir.1992); see also Founding Church of Scientology v. Smith, 721 F.2d 828, 830 n. 4 (D.C.Cir.1983). It is evident that the Department and plaintiff both believe that the information at issue in this case does not qualify as "low 2" information.[2] It is therefore necessary to examine whether the information at issue in this case qualifies as "high 2" information.

■ Our Court of Appeals has developed a two-part test for determining when such information qualifies as "high 2" information and consequently is exempt from mandatory disclosure. The test requires (1) that a requested document be predominantly internal, and (2) that its disclosure "significantly risks circumvention of agency regulations or statutes." Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1074 (D.C.Cir. 1981) (en banc).

### A. Predominantly internal

■ To qualify under the first prong of Crooker as "predominantly internal" information, the information at issue must not constitute "secret law." See Cox v. United States Dep't of Justice, 601 F.2d 1, 5 (D.C.Cir.1979). In other words, the information must not "purport to regulate activities among members of the public [and must not] set standards to be followed by agency personnel in deciding whether to proceed against or to take action affecting members of the public." Id.; see National Treasury Employees Union v. United States Customs Serv., 602 F.Supp. 469, 474 (D.D.C.1984).

This general rule, however, affords a measure of deference to agency law enforcement activities. For example, courts in the District of Columbia have treated agency guidelines for conducting investigations and identifying law violators as "predominantly internal." See PHE, Inc. v. Department of Justice, 983 F.2d 248, 251 (D.C.Cir.1993);

---

2. Defendants expressly state that the information at issue in this case involves only "high 2" information. See Mem. of P. & A. in Support of Def.s' Mot. for Summ. J. at 5. Moreover, it is evident that plaintiff does not believe that the information at issue is "low 2" information, which involves merely trivial personnel matters, because plaintiff emphasizes the great public interest in the information at stake. See Hem. of P. & A. in Support of Pl.'s Mot. for Summ. J. at 7.

*National Treasury Employees Union*, 602 F.Supp. at 474; *Windels, Marx, Davies & Ives v. Dep't of Commerce*, 576 F.Supp. 405 (D.D.C.1983); *Crooker*, 670 F.2d at 1051.

For example, in *Crooker*, a plaintiff brought an action against the Bureau of Alcohol, Tobacco and Firearms to obtain release, under the FOIA, of portions of a training manual which concerned surveillance. The plaintiff argued that the manual was not "predominantly internal" because it directly affected the public at large: the citizenry "certainly has an interest in the manner in which they are spied on by agents of the federal government." 670 F.2d at 1054. The court rejected that argument and held that the manual was "predominantly internal" because it sought only to instruct agency personnel and did not attempt "to modify or regulate public behavior—only to regulate it for illegal activity." *Id.* at 1075.

Similarly, in *Windels*, 576 F.Supp. at 405, a plaintiff commenced an action under the FOIA seeking disclosure of a computer program used by the United States Department of Commerce. The program could perform the necessary calculations to determine if a foreign company violated United States antidumping laws. The court held that the program was "predominantly internal" because the program "merely instructs a computer on how to detect possible violations of the law, and makes no attempt to modify or regulate public behavior." *Id.* at 412.

In the present case, plaintiff contends that the trigger figures, error rates, and potential fines withheld by defendants constitute "secret law" and thus are not "predominantly internal."[3] Plaintiff maintains that such information is "secret law" because it consists of interpretations used by the agency "in the discharge of its regulatory duties and in its dealings with the public." Mem. of P. & A. in Support of Pl.'s Mot. for Summ. J. at 8–9.

Contrary to plaintiff's assertion, however, trigger figures, error rates, and dollar amounts of potential fines, as established by the Department, are "predominantly internal." The Department uses all three categories of this information for enforcement purposes only, and does not attempt to use it to set out regulations for the public.

First, trigger figures are figures established by the Department to alert the Department that an educational institution may be seriously mismanaging its Title IV funds. Def.s' Mot. for Summ. J. Ex. A, Fenton Decl. at ¶ 32. As such, the figures are used solely for enforcement purposes and not to attempt to regulate the public.[4] This is evident because the law that regulates educational institutions with regard to Title IV funds is clearly set out in the regulations published by the Department. *See* 34 C.F.R. pt. 668 (1995).[5]

---

**3.** "Benchmark" redactions were made by defendants in the following documents: (1) Institutional Review Branch ("IRB") Procedure Memoranda 88–3, 89–5, 91–21, 91–22, 91–25, 92–8, 92–12, 93–7; (2) Reimbursement User's Manual pages 5, 15, and 22; and (3) Determining Fines document.

"Error rate" redactions were made by the defendants in the following documents: (1) IRB Memoranda 89–6, 89–11, 91–13, 91–15, 91–21, 91–27, 92–15, 93–8; (2) Audit Resolution Branch ("ARB") Procedure Memorandum 94–3; (3) Reimbursement User's Manual, page 16; and (4) Determining Fines document.

"Dollar amount" redactions were made by defendants in the following documents: (1) IRB Procedure Memoranda 89–5, 90–7, 90–10, 90–11, 91–7, 91–10, 91–15, 91–23, 92–7 and 93–7; and (2) Determining Fines documents. Def.s' Mot. for Summ. J. Ex. A, Fenton Decl. at ¶ 32.

**4.** For example, the Department monitors the cash management practices of institutions that receive student financial aid funds to ensure that the federal funds are not maintained in excess of immediate disbursement needs. IRB Memorandum 91–22 explains what the Department means by "extreme" excess cash balances: this is the trigger amount that alerts program reviewers that an institution may be violating the excess cash regulations and should, therefore, be subject to closer scrutiny. The Department, however, has publicly defined "excess cash" as the amount of money that exceeds three days' need for certain institutions. *See* 34 C.F.R. § 668.163(a)(2)(ii) (1995).

**5.** Moreover, the Department routinely distributes to educational institutions that participate in Title IV programs materials that it has published in the *Federal Register* and the *Code of Federal Regulations*. The Department further distributes other information such as "Student Financial Aid Handbooks, Counselor's Handbook, Dear Colleague Letters, Verification and Audit Guides, the Blue Book (a guide to accounting, recordkeeping and reporting by postsecondary institutions), De-

■ Second, error rates, as established by the Department, identify the Department's tolerances for mistakes. *See* Def.s' Mot. for Summ. J. Ex. A., Fenton Decl. at ¶ 32. Although Title IV publicly sets a zero tolerance level for certain errors, the Department, as a practical matter, must allocate its limited resources in a way that enables it to most closely scrutinize the institutions exhibiting the most serious violations. These tolerances help the allocation process in that they provide internal guidance to staff about how, when, and where they should concentrate their regulatory oversight. Thus, this information is utilized solely for enforcement purposes. This does not constitute "secret law" because the law with which educational institutions must comply is clearly set forth in the regulations published by the Department in 34 C.F.R. pt. 668 (1995).

■ Finally, dollar amounts of potential fines, as established by the Department, do not constitute "secret law." This is because educational institutions are made fully aware, by the regulations published by the Department in 34 C.F.R. pt. 668 (1995), that any violation of Title IV may result in fines of up to $25,000. *See* 34 C.F.R. § 668.84 (1995); 20 U.S.C. § 1094. Moreover, the discretion given to the Department to assess fines is, again, merely for enforcement and not regulatory purposes. See Def.s' Mot. for Summ. J. Ex. A, Fenton Decl. at ¶ 34.

### B. *Significant risk of circumvention*

■ To qualify under the second prong of *Crooker,* and thus fall under Exemption 2, disclosure of the contested information must also significantly risk providing the subjects of regulations with information that could enable them to circumvent such regulations. *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 670 F.2d at 1074; *see also National Treasury Employees Union,* 602 F.Supp. at 469.

Release of documents that reveal the nature and extent of specific agency investigations has consistently been held protected on this circumvention basis. *See Albuquerque*

*Publishing Co. v. United States Dep't of Justice,* 726 F.Supp. 851, 854 (D.D.C.1989) ("[t]he public has no legitimate interest in gaining information [pertaining to violator and informant codes] that could lead to the impairment of DEA investigations"); *Windels,* 576 F.Supp. at 408 (release of computer program used to detect violations of anti-dumping laws would enable foreign companies to adjust sales transactions to avoid detection of violation); *PHE,* 983 F.2d at 249–51 (redacted page of FBI investigative manual that "detailed specific ... sources of information available to Agents investigating obscenity violations" was exempt from disclosure because the FBI logically demonstrated how the "release of this information would risk circumvention of the law because '[k]nowing what records or documents are likely to be scrutinized by the FBI ... provides violators with an opportunity to impede lawful investigations' ").

In the present case, disclosure of the trigger figures, error rates, and dollar amounts of potential fines would "significantly risk circumvention of agency regulations." Release of trigger figures would notify institutions of the amount of noncompliance that the Department may tolerate before imposing sanctions. Similarly, release of error rate tolerances would allow schools to maneuver around the regulatory requirements of the Title IV programs by keeping their deficiencies within the tolerance levels that are not considered significant. Finally, disclosing the dollar amounts of potential fines also would serve no purpose other than to encourage violations of Title IV regulations. As the Department explained:

> If an institution knows in advance that certain conduct will result in only a nominal fine, then it might be willing to engage in that conduct and then just absorb the fine. Conversely, it might decide to focus its compliance efforts only on matters for which significant fines would be levied. Giving institutions the wherewithal to engage in a cost/benefit analysis in order to choose their level of compliance would sub-

livery System Training Materials, and the ED Guide to Payment Management System." Def.s' Mot. for Summ. J. Ex. A, Fenton Decl. at ¶ 18.

All of this information explains what the educational institution needs to do to comply with Title IV requirements. *Id.*

stantially undermine the Department's regulatory efforts and thwart its program oversight.[6]

Def.s' Mot. for Summ. J. at 13.

### III. Defendants have described the documents withheld with the requisite specificity

■ Due to the fact that only the agency knows the substance of the information withheld, "agency affidavits have immense significance in a FOIA case." *PHE*, 983 F.2d at 250. Consequently, summary judgment may be granted to a government agency in a FOIA case only if the agency files an affidavit that describes "the documents withheld and the justifications for nondisclosure in enough detail and with sufficient specificity to demonstrate that the material withheld is logically within the domain of the exemption claimed." *King v. United States Dep't of Justice*, 830 F.2d 210, 217 (D.C.Cir.1987). The government agency withholding such information pursuant to the FOIA bears the burden of justifying its decision to withhold information. *Id.*

Plaintiff maintains that defendants did not provide the requisite detailed affidavits because defendants did not provide "corresponding information identifying which of the documents provided were intended to respond to which of Plaintiff's requests." Moreover, plaintiff states that defendants "failed to identify the relevance of the documents, state that all relevant documents were provided, or identify those documents which were withheld." Def.s' Mot. for Summ. J. at 14–15.

■ The Court finds that plaintiff's assertions are unsupported by both the facts and the law. The 19–page Fenton Declaration describes in detail exactly which documents are being withheld. The affidavit not only lists all documents that are responsive to plaintiff's request, but specifies the number of pages released and the number of pages redacted in each of the responsive documents. *See* Def.s' Mot. for Summ. J. Ex. A, Fenton Decl. at ¶ 14. Furthermore, the affidavit describes in detail the information being withheld and specifies why this information is protected.[7]

■ Moreover, to meet their burden for summary judgment, defendants are not required to identify the relevance of the documents released, state that all relevant documents have been provided or explain to plaintiff which response corresponds to which request. *See, e.g., N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 162, 95 S.Ct. 1504, 1522, 44 L.Ed.2d 29 (1975); *Gabel v. Commissioner*, 879 F.Supp. 1037, 1039 (N.D.Cal. 1994). Rather, under the FOIA, the government agency need only describe with reasonable specificity the information withheld. *PHE*, 983 F.2d at 250; *National Treasury Employees Union*, 602 F.Supp. at 472; *King*, 830 F.2d at 217.

It is also significant to note that a *Vaughn* index is not required in the instant case. *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir. 1973). Such an index is required only where more than one FOIA exemption is being claimed.[8] *National Treasury Employees Union*, 602 F.Supp. at 473 (D.D.C.1984).[9] In

---

**6.** The Fenton Declaration emphasized that "[t]he Department has years of experience with institutions that deliberately structure their operations to avoid detection while stealing Federal funds." It stated further that "over the past three fiscal years, program reviews have resulted in the Department imposing 26 emergency actions, which immediately suspend the school's participation in all Title IV programs, and 66 terminations, which bar institutions for at least eighteen months from participation in the Title IV programs." See Def.s' Mot. for Summ. J. Ex. A, Fenton Decl. at ¶ 22.

**7.** The information falls within one of the three categories described above: trigger figures, error rates, or dollar amounts of fines. The affidavit

specifically categorizes the withheld information. *Id.* at ¶ 32.

**8.** A *Vaughn* index requires that the "agency specify in detail which portions of the document are disclosable and which are allegedly exempt. This could be achieved by formulating a system of itemizing and indexing that would correlate statements made in the Government's refusal justification with the actual portions of the document." *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C.Cir.1973).

**9.** In *National Treasury Employees Union*, 602 F.Supp. at 473, the court held:

This case does not present the type of anomaly which existed in *Vaughn*. All of the documents

this case, defendants claim that the withheld information is exempted under only one FOIA exemption, namely Exemption 2; consequently, a Vaughn index is not required.

In view of the specificity of the Fenton Declaration and the limited amount of information withheld by the Department, the Court concludes that defendants have established the validity of their Exemption 2 claim. The substance of the withheld information is clear from the descriptions of the Declaration. Moreover, the Fenton Declaration logically demonstrates how the information withheld is predominantly internal and how its release would significantly risk circumvention of Department regulations.

### Conclusion

For the reasons stated above, the Court finds that there is no genuine issue of material fact in dispute and that defendants are entitled to judgment as a matter of law. Accordingly, the Court grants defendants' motion for summary judgment and denies plaintiff's motion for summary judgment. An appropriate Judgment accompanies this Opinion.

### JUDGMENT

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that defendants' motion for summary judgment is granted. It hereby further is

ORDERED, that plaintiff's motion for summary judgment is denied. It hereby further is

ORDERED, that judgment be entered in favor of defendants.

_____

withheld by defendants are allegedly exempt from disclosure under one FOIA exemption, Exemption (b)(2), thereby nullifying the need to formulate the type of itemization and correlation system required by the Court of Appeals in *Vaughn.*